## TABLE OF AUTHORITIES

**Cases**

9 U.S. Code § 10(a) ........................................................................................... 5, 13

*Andros Compania Martima v. Marc Rich & Co., A.G.*, 579 F. 2d. 691, 699 (2d Cir. 1978) ....... 15

*Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 261 (2d Cir. 2003). 37

*Bell Aerospace Co. Div. of Textron, Inc. v. Local 516*, 500 F.2d 921, 920 (2d Cir. 1974) .......... 31

*Christiana General Ins. Corp. of New York v. Great American Ins. Co.*, 070 F.2d 268, 274 (2d Cir. 1992) ........................................................................................ 39

*Cofinco, Inc. v. Bakrie & Bros., N.V.*, 395 F. Supp. 613m, 615 (S.D.N.Y 1975) ....................... 31

*Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968) ................. 13

*DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 823 (2d Cir. 1997), cert. denied, 522 U.S. 1049, 139 L. Ed. 2d 639, 118 S.Ct. 695 (1998). ..................................................... 37

*Encyclopedia Universals DS.A. v. Encyclopedia Britannica Inc.*, 403 F.3d 85, 92 (2nd Cir. 2005) .............................................................................................. 13

*Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) ...................................... 37

*Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) ....................................................... 39

*Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998) ............................................. 36

*Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) ..................... 38

*Kaplan v. First Options*, 19 F.3d 1503, 1512 (3d Cir. 1994) .................................................... 37

*Law of Reinsurance*, Strain, Thompson Reuters, 2010, Chapter 12:8, "Usage and Custom" ...... 39

*Life Receivables Trust v. Syndicate 102*, 549 F.3d 210, 217 (2d Cir. 2008) ............................. 35

*Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 31 (2d Cir. 2004). ........................................... 14

*Morelite Constr. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984) ................................................................................ 14

*New York Telephone Co. v. Communication Workers of America*, 256 F.3d 89, 92-93 (2d Cir. 2001) ............................................................................................ 37

*Newark Sterotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3rd Cir. 1968) ............................................................................................ 31

*Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) ............................................................................................ 39

*Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 (2d Cir. 1986) .............................. 14, 22

*Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 (2d Cir. 1986). .............................. 14, 22

*PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp. 2d 631 (E.D. Pa. 2009) quoting *Mut. Fire, Marine & Inland Ins. Co. v. Norad Rein Co.*, 868 F.2d 52 (3d Cir. 1989) ............................................................................................ 37

*Robbins v. Day*, 954 F.2d 679, 685 (11th Cir. 1992) ............................................................... 31

*Sanford Home for Adults v. Local 6, IFHP*, 665 F. Supp. 312, 320 (S.D.N.Y. 1987) ................. 15

*Sanko S.S. Co. v. Cook Industries, Inc.*, 495 F.2d 1260, 1263 (2d Cir. 1973) ........................... 14

*Scandinavian Reinsurance Co v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) ............................................................................................ 14

*See also Savers Prop. and Cas. Co., et al v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 717 (6th Cir. 2014) ...................................................................................... 13

*Swift Indus., Inc. v. Botany Indus., Inc.*, 466 F.2d 1125, 1130 (3d Cir. 1972). ......................... 40

*TIG Ins. Co. v. Global Int'l. Reinsurance Co.*, 640 F. Supp. 2d 519, 523 (S.D.N.Y. 2009) ........ 13

*Travelers Indemnity v. Gerling Global Reinsurance Corp.*, 2001 U.S. Dist. LEXIS 6684 (S.D. N.Y. 2001) ................................................................................................................ 13

*United States v. Int'l Bhd of Teamsters*, 170 F.3d 136, 147 (2d Cir. 1999) ................................. 14

*W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162-163 (1990) .................................................. 39

*Wilko v. Swan*, 346 U.S. 427 (1953). ......................................................................................... 36

**Statutes**

9 U.S. Code § 10(a).................................................................................................................. 5, 13

TABLE OF CONTENTS
CERTAIN UNDERWRITING AT LLOYD'S LONDON
MOTION TO VACATE ARBITRATION AWARD

CERTAIN UNDERWRITING MEMBERS OF LLOYD'S LONDON
V.
INSURANCE COMPANY OF THE AMERICAS

I.      INTRODUCTION..................................................................................5
II.     STATEMENT OF QUESTIONS INVOLVED.........................................9
III.    FACTS AND PROCEDURAL HISTORY...............................................10
IV.     LEGAL ARGUMENT.............................................................................14
        A.      The final award must be vacated because Arbitrator Campos failed to
        disclose his extensive business and financial relationships with Ricardo Rios,
        John C. Iorillo, Benton Morley and other interested "players" operating out of
        the 4140 Mesa address.................................................................14
                1.      Alex J. Campos' failure to disclose long-standing business and
        financial relationships with ICA and the principals of ICA are numerous and
        significant, resulting in an award that was obtained through corruption, fraud or
        undue means perpetrated by the Insurance Company of the Americas and Mr.
        Campos...................................................................................18
                2.      Campos also failed to disclose his significant business and
        financial relationships with ICA President John Iorillo and other interested
        Players at the 4140 Mesa Address storefront: In Re: Human Dynamic
        Corporation.............................................................................23
        B.      The award must be vacated due to Campos' failure to disclose his less
        than stellar background in the financial services industries which renders him
        unfit to serve as an arbitrator.......................................................29
                1.      Georgia Department of Banking and Finance.....................29

                2.      Federal Deposit Insurance Company................................30

                3.      Other Litigation that Rendered Campos Unfit to Serve.........31

        C.      The arbitration proceeding violated fundamental fairness of Underwriters
        because the panel failed to stop the proceedings to allow for the production of
        material information...................................................................32
        D.      The final award must be vacated because it demonstrates a manifest
        disregard of the law...................................................................37

IV.     CONCLUSION........................................................................................42

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| CERTAIN UNDERWRITING MEMBERS AT LLOYD'S OF LONDON, | : | |
| | : | |
| Petitioner, | : | |
| | : | NO: 1: 16-CV-00323 |
| v. | : | |
| | : | |
| INSURANCE COMPANY OF THE AMERICAS, | : | |
| | : | |
| Respondents. | : | |

## PETITIONER'S MOTION TO VACATE ARBITRATION AWARD

Petitioner's Certain Underwriting Members at Lloyd's of London by and through its
attorneys, Weber Gallagher Simpson Stapleton Fires & Newby, LLP, respectfully move this
Honorable Court for an Order vacating the arbitration award issued against them and in support
thereof submits the below.

### I.     INTRODUCTION

Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. 10, Underwriters
move this Court to vacate the award entered on October 19, 2015 (the "Final Award") in a
reinsurance arbitration between the Insurance Company of the Americas (hereinafter referred to
as or "ICA") and Certain Underwriting Members at Lloyd's of London[1]  (hereinafter referred to
as "Petitioner" or "Underwriters"). See Exhibit 1 for a redacted copy of the Final Award[2].

Based upon well-settled principles of U.S. arbitration law and precedent, this Court must
vacate the Final Award for numerous reasons.   Firstly, arbitrator Alex Campos engaged in

---

[1] Underwriters includes the entities noted on the Slip attached at Schedule 1, including Atrium, S.A. Meacock,
Faraday, Brit, GSC, and Beazley.
[2] A subsequent motion for leave to file under seal will be filed.

misconduct by failing to disclose his prior, current and on-going significant business and financial relationships with the principals of ICA, including but not limited to Ricardo Rios the Chief Financial Officer of both ICA and **Campos' company**, Vensure Employer Services, Inc. ("Vensure Employers"); Benton Morley, the National Claims Director of both ICA and Vensure Employers; and John Iorillo, the President of ICA and the Chief Financial Officer of Vensure Employers.

Campos also failed to disclose his other significant long-term financial and business relationships with Iorillo and other ICA related executives with such companies as Infinet Holdings and Human Dynamics Corporation, which companies, along with **Campos' company**, P.C. General Agency, k/n/a P.C. Processing, Inc. ("P.C. Processing"), have been subject to protracted litigation involving allegations of fraud and the improper transfer of funds through banks in Costa Rico in a bankruptcy matter entitled *In re Human Dynamics Corporation and Reorganized Human Dynamic Corporation,* United States District Court for the District of Arizona, No. CV11-251-PHX-DGC (BK No. 2:05-10210 RTB (hereinafter referred to as "Human Dynamics"). In fact, as will be discussed later in this Motion, the conservator of Human Dynamics obtained a judgment against Doug Anderton, one of the "players" in Campos' group, in excess of $4.2 million and against Campos' company, P.C. Processing, in the amount of $1.133 million regarding these fraudulent transfers. We are further advised that the conservator will shortly be executing on the $1.133 million judgment in an enforcement action in the United States District Court for the Northern District of Georgia (C.V.:1:12-mi-00178-WSD-GGB) that now includes Vensure Employers as a defendant in the Georgia collection action. See Exhibit 2. We are also advised that ICA may have been pledged as security by Campos [ICA's arbitrator] in the Georgia matter.

Underwriters have also learned that arbitrator Campos, Iorillo , Rios, Benton Morley, and a core group of other individuals (the "Players") run the foregoing companies, along with other companies, out of a "store front", that being 4140 E. Baseline Rd, Suite 201, Mesa, AZ  85206 (hereinafter referred to as "the 4140 Mesa Address"].  The 4140 Mesa Address is the same address ICA used to communicate with and bill Underwriters in this matter.  Further, the people doing the decision making and billing for ICA **were and are executives in Campos' companies**.  Despite having an affirmative duty to do so, at no time did Campos disclose information regarding these significant "intertwined" business and financial relationships.  In essence, you have arbitrator Campos, Iorillo, Rios, Benton Morley, Robert Morley, Thomas Lindsay and the Anderton family spread over numerous companies primarily run out of the 4140 Mesa Address, working for common global financial objective of all companies and individuals. In essence, Campos was paying himself when he rendered the Final Award.  This intentional lack of disclosure by Campos when faced by his own executives during the arbitration fails the requirement that an arbitrator is required to disclose "any circumstances likely to give rise to justifiable doubts as to his impartiality or independence" as required by the Federal Arbitration Act.  See 9 U.S. Code § 10(a).

Campos also failed to disclose a cease and desist order ("Consent Order") issued against him and another one of his companies, One World Mortgage Corp. ("One World") on May 28, 2009 by the Georgia Department of Banking and Finance, where he was prohibited from engaging in any supervision of One World for a period of five (5) years due to his conduct regarding mortgage lending practices. See Exhibit 3. He did not disclose a settlement agreement executed on February 22, 2012 by him, individually, and also on behalf of One World, with the Federal Deposit Insurance Corporation ("FDIC").  The FDIC settlement involved a judgment of

$3,875,448.51 against a Campos' subsidiary of One World.  See Exhibit 4. Further, he did not disclose that the former owner of ICA, IPA Acquisitions, Inc. was suing ICA, Iorillo (his CFO) and others.   Among the allegations in the Amended Complaint against ICA was that these individuals wrongfully transferred assets out of a trust account owned by ICA in exchange for share of **Campos' company**, Vensure.  See Exhibit 5. Any of these matters alone, if disclosed, would render him unfit to serve as an arbitrator in an insurance and reinsurance matter, i.e. a matter involving the financial services industry.

Furthermore, the Panel conducted the Arbitration Hearing in a manner that violated fundamental fairness and the rights of Underwriters.  The Panel failed to continue the Arbitration Hearing upon Underwriters' Motion, when it was discovered that ICA had not produced documents ordered by the Panel at the Organizational Meeting and requested by Underwriters in their Discovery Requests.

Finally, the Panel acted "irrationally" in rendering the Final Award, in that it failed to apply the proper legal standard regarding Per Occurrence Clash Catastrophe Excess of Loss Agreement 0274/04 Reinsurance Agreement and essentially rewrote the terms of the contract in a way contrary to the clear and unambiguous language of the contract.

U.S. courts have long circumscribed the review of arbitral awards based upon the notion that the arbitrators would uphold the integrity of the arbitral process.  When, however, the arbitrators breach the integrity of the process and fail to disclose crucial business and financial relationships and have been engaged in questionable ethical conduct, the principle of the arbitral autonomy must yield to judicial review and action.  Accordingly, Underwriters move for this Court to vacate the Final Award and remand this matter to a new tribunal.  The misconduct here

is exceptional and mandates the necessity of remanding to a new panel that will be willing and able to resolve the outstanding issues in the dispute.

## II.   STATEMENT OF QUESTIONS INVOLVED

1.    Whether an arbitration award must be vacated when an arbitrator has past, current and on-going business and financial relationships with principals of one of the parties, Insurance Company of the Americas, which were not disclosed prior to or during the arbitration?

**Suggested Answer:   Yes.**

2.    Whether an arbitration award must be vacated when the arbitrator does not disclose that key executives of one of the parties, Insurance Company of America, are also key executives of his companies?

**Suggest Answer:  Yes**

3.    Whether an arbitration award must be vacated where the arbitrator failed to disclose that he and his companies were subject to cease and desist orders in the financial services industry?

**Suggested Answer:   Yes.**

4.    Whether the arbitration award must be vacated where the arbitration proceeding was conducted in such a manner to violate the fundamental fairness of the arbitration?

**Suggested Answer: Yes.**

5.    Whether the arbitration award must be vacated when the arbitration award is "irrational" based upon the evidence presented and the clear and unambiguous language of the contract involved?

**Suggested Answer: Yes.**

8

### III.    FACTS AND PROCEDURAL HISTORY

This is a reinsurance matter, involving two (2) underlying workers compensation claims, the Leon Arnold claim with a date of loss of June 14, 2005 (the "Arnold claim") and the Alan Kringel claim with a date of loss of July 26, 2005 (the "Kringel claim") (hereinafter jointly referred to as the "Arnold and Kringel claims"). The Arnold and Kringel claims arise out of different loss occurrences, i.e. different events in 2005. ICA is the insurer for the Arnold and Kringel claims.

Underwriters were first notified of the Arnold and Kringel claims by ICA in March 2011. ICA transmitted this notice pursuant to the Per Occurrence Clash Catastrophe Excess of Loss Treaty 0274/04 (the "Clash Catastrophe Treaty 0274" or "Clash Catastrophe Treaty") entered into by Underwriters and ICA and/or Oriska Insurance Company ("Oriska") and/or Reinsurance Company of America, Inc. ("RCA"). The Clash Catastrophe Treaty was effective December 31, 2004. See Exhibit 6 for a copy of the Clash Catastrophe Treaty.

At the time of the effective date of the Clash Catastrophe Treaty, ICA, Oriska and RCA were inter-related companies, originally owned and controlled by James Kernan. In 2009, ICA was purchased by Gary T. Hirst through the company he controls, First Florida Equity Holdings, Inc. ("First Florida") from the Florida Department of Insurance. It is our understanding that Mr. Kernan, was involuntarily removed from ICA when he pled guilty to a felony count involving the employment of a known felon in his insurance operations. See Exhibit 7 (Kernan's Guilty Plea)

In 2010, Mr. Kernan, through his former holding company, IPA Acquisitions, Inc., sued ICA, Mr. Hirst, John C. Iorillo, Robert G. Morley, Frederick Glenn Carrol and Donald Robert Anderson [as officers/directors of ICA] in the United States District Court for the Northern

District of New York.  (See Exhibit 5)  Among the allegations in the Amended Complaint is that the foregoing individuals, misappropriated ICA assets including the "transfer to themselves $1.5 million from ICA Custody assets for 'worthless' shares of a company called Vensure."  See Exhibit 5, paragraph 18.  It is also alleged that "accessory Ricardo Rios… aided and abetted the scheme or wrongful acts…."  See Exhibit 5, paragraph 4.  At the time of the October 5, 2015 Arbitration Hearing for this matter, *IPA Holdings v. ICA* was still open and pending.[3]  It also preceded Campos' appointment as ICA's arbitrator. Vensure is Campos' company.  Iorillo, Robert Morley and Rios, ICA's principals, are also executives with arbitrator Campos' company, Vensure Employers.

As way of background, there are two (2) primary types of reinsurance – facultative and treaty.  Facultative reinsurance is:

> A form of reinsurance whereby each exposure the ceding wishes to ensure is offered to the reinsurer and is contained in a single transaction.  The submission, acceptance, and resulting agreement is required on each individual risk that the ceding company seeks to reinsure.  That is the ceding company negotiated an individual reinsurance agreement for every policy it will reinsurer.  However, the reinsurer is not obligated to accept every or any submission.[4]

Treaty reinsurance is:

> A form or reinsurance in which the ceding company makes an agreement to cede certain classes of business to a reinsurer.  The reinsurer, in turn, agrees to accept all business qualifying under the agreement, known as a "treaty".  Under a reinsurance treaty, the ceding company is assured that all of its risks falling within the terms of the treaty will be reinsured in accordance with treaty terms.[5]

Catastrophe reinsurance is

> A form of excess of loss reinsurance which, subject to a specified limit, indemnifies the reinsured company for the amount of loss in excess of a specified retention with respect to the accumulation of losses resulting from a catastrophic

---

[3] It is our understanding that the matter is still open.
[4] IRMI, "Glossary of Insurance & Risk Management Terms".
[5] IRMI, "Glossary of Insurance & Risk Management Terms".

event or series of events.  The actual reinsurance document is referred to as a "catastrophe cover".[6]

ICA is the ceding company in this matter; Underwriters are the reinsurer.

Clash Catastrophe Treaty 0274 is a treaty, which was underwritten as a workers compensation catastrophe cover, that being coverage for two or more workers compensation losses arising from the same "loss occurrence".  The purpose of the workers compensation Clash Catastrophe Treaty is to protect the cedant [insurer] from a catastrophic event such as September 11 or a mining accident in which multiple workers are injured in the same accident of event.

Clash Catastrophe Treaty 0274/04 specifically states:

**AGREEMENT NUMBER: 0274/04**

**PER OCCURRENCE CLASH CATASTROPHE
EXCESS OF LOSS**

\*\*\*

This Agreement is to indemnify the Reinsured on respect of claims arising from their liability under business classified by the Reinsured as Workers' Compensation, subject to the terms, conditions and warranties contained herein

**ARTICLE I**

**REINSURING CLAUSE**
(In respect of 12 months commencing 31st December 2004)

**Section A**
This Agreement is only to pay the excess of the Ultimate Net Loss of USD 1,000,000 each loss occurrence with a limit of liability to the Reinsurers of USD 1,500,000 ultimate net loss each loss occurrence.

**Section B**
This Agreement is only to pay the excess of the Ultimate Net Loss of USD 2,500,000 each loss occurrence with a limit of liability to the Reinsurers of USD 2,500,000 ultimate net loss each loss occurrence.

---

[6] Guy Carpenter &  Co., "Glossary of Reinsurance Terms".

\*\*\*

## ARTICLE 5

**WARRANTIES**

It is warranted that:

1) No loss or losses are recoverable under this Agreement unless there are two or more lives, with a minimum each life value of USD 750,000.

2) The maximum claim any one person shall not exceed USD 2,500,000 (including costs) or so deemed.

\*\*\*

## ARTICLE 6

**ULTIMATE NET LOSS**

The term "Ultimate Net Loss" means the actual loss, including Loss Adjustment Expenses, paid or to be paid by the reinsured on its net retained liability after making deductions for all recoveries, salvage, subrogations and all claims on inuring reinsurance, whether collectible or not.

\*\*\*

## ARTICLE 7

**DEFINITION OF LOSS OCCURRENCE/EVENT**

The term "Loss Occurrence" as used in this Agreement shall mean any one disaster or casualty or accident or loss or series of disasters or casualties or accidents or losses arising out of or caused by one event.

\*\*\*

See Exhibit 6.

ICA has admitted that the Arnold and Kringel claims arise out of separate loss occurrences. Moreover, under Section A of Clash Catastrophe Treaty 0274/04, among other things, no loss is recoverable until the loss exceeds $1,000,000 Ultimate Net Loss, each loss occurrence.

As such, Underwriters disagreed over the propriety of the billing of the Arnold and Kringel claims to the Clash Catastrophe Treaty because, among other things, they each arose from separate loss occurrences. ICA, through the offices of Johnson, Gallagher, Magliery, LLC

12

("Johnson Magliery") demanded arbitration and appointed Alex J. Campos as its arbitrator on December 23, 2014.  See Exhibit 8.   In compliance with Article 24 of the Clash Catastrophe Treaty, Underwriters then appointed Trevor A. Clegg as their arbitrator.  When the parties could not agree to an umpire, Ben F. Hernandez, who was a candidate proposed by ICA, was selected by the drawing of lots utilizing the Dow Jones Industrial average.

This matter proceeded to an Organizational Meeting on May 11, 2015, through Discovery, to the Arbitration Hearing (October 5, 2015 through October 9, 2015).  The Panel issued its Final Award[7] on October 19, 2015, which included the following rulings:

- The Clash Catastrophe Treaty does not require two or more persons be injured from the same loss occurrences.

- Underwriters are responsible for the Arnold claim and the Kringel claim in the amount of $2,507,872.57.

- Underwriters are entitled to an offset for reinstatement premium in the amount of $1,465,780.24 ($978,280.24 under Section A and $487,500 under Section B of the Clash catastrophe Treaty)

See Exhibit 1.

Subsequent to the Final Award, Underwriters discovered that Campos' financial interests and those of the principals of ICA are intertwined and have been so for years.   While Campos had an affirmative duty to disclose these significant business and financial relationships with the following co-mingled ICA/Vensure Employers executives - John C. Iorillo, President of ICA, Robert G. Morley, Secretary of ICA, Benton Morley, National Claims Manager for ICA and Vensure Employers, Ricardo Rios, Treasurer of ICA, he sat in stone-faced silence in an effort to deceive the Panel and to commit a fraud upon the arbitration process.  As will become evident by the conclusion of this Motion, *Campos has a symbiotic financial relationship with ICA, its*

---

[7] Since the Panel issued a final award, it is *functus officio.*

*principals and related "Players".* As this Court will see, "Oh what a tangled web we weave when first we practice to deceive."[8]

## IV.   LEGAL ARGUMENT

### A. THE FINAL AWARD MUST BE VACATED BECAUSE ARBITRATOR CAMPOS FAILED TO DISCLOSE HIS EXTENSIVE BUSINESS AND FINANCIAL RELATIONSHIPS WITH RICARDO RIOS, JOHN C. IORILLO, BENTON MORLEY AND OTHER INTERESTED "PLAYERS" OPERATING OUT OF THE 4140 MESA ADDRESS.

As a general rule, an arbitrator's decision is entitled to "great deference," and only a narrow set of circumstances warrant vacatur. *TIG Ins. Co. v. Global Int'l. Reinsurance Co.*, 640 F. Supp. 2d 519, 523 (S.D.N.Y. 2009). In addition, challenging an arbitrator or umpire is only proper after the award has been entered. *Travelers Indemnity v. Gerling Global Reinsurance Corp.*, 2001 U.S. Dist. LEXIS 6684 (S.D. N.Y. 2001); *See also Savers Prop. and Cas. Co., et al v. Nat'l Union Fire Ins. Co.*, 748 F.3d 708, 717 (6th Cir. 2014).

However, an arbitral tribunal that was improperly composed has no power to bind the parties. *Encyclopedia Universals DS.A. v. Encyclopedia Britannica Inc.*, 403 F.3d 85, 92 (2nd Cir. 2005). The Federal Arbitration Act is clear that an award may be vacated where (1) the award was procured by corruption, fraud, or undue means or (2) where there was evident partiality or corruption in the arbitration, or either of them. See 9 U.S. Code § 10(a).

The Supreme Court addressed the meaning of "evident partiality" under 10(a)(2) in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968) and concluded that it existed when one of the parties was a regular, though sporadic, customer of an arbitrator, who failed to disclosure that fact. *Id.* at 146-148. In that case, although there was no evidence of actual bias on the part of the arbitrator, Justice Black, stated "we can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that

---

[8] Sir Walter Scott.

arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Id.* at 149.  Justice White, concurring, also wrote, "Arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id.* at 150.

In the Second Circuit, "evidence partiality within the meaning of 9 U.S.C. §10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984); *Scandinavian Reinsurance Co v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012); *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 31 (2d Cir. 2004).   "Among the circumstances under which the evident-partiality standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties." *Id.* Further, "an arbitrator is disqualified only when a reasonable person, considering all the circumstances, would have to conclude that an arbitrator was partial to one side. *Applied Industrial*, 492 F.3d at 137.  Proof of actual bias is not required, however. *See United States v. Int'l Bhd of Teamsters*, 170 F.3d 136, 147 (2d Cir. 1999).  A conclusion of partiality can be inferred "from objective facts inconsistent with impartiality." *Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 (2d Cir. 1986). Additionally, "the relationship between a party and the arbitrator may, in some circumstances, create a risk of unfairness so inconsistent with basic principles of justice that the arbitration award must automatically be vacated." *Id.* at 423-24.   Specifically, where dealings of an arbitrator "might create an impression of bias" they must be disclosed. *See Sanko S.S. Co. v. Cook Industries, Inc.*, 495 F.2d 1260, 1263 (2d Cir. 1973). Disclosures by arbitrators should be

encouraged; failure to make appropriate disclosures will justify setting aside an award." *Andros Compania Martima v. Marc Rich & Co., A.G.*, 579 F. 2d. 691, 699 (2d Cir. 1978).

In *Morelite*, the Court vacated an arbitration award where there was a non-disclosed father-son relationship between the arbitrator and president of the union party, which provided strong evidence of partiality and was unfair to the construction contractor. *Morelite Constr. Corp.*, 748 F.2d at 84. In finding this decision, the *Morelite* Court stressed the importance was on the disclosure of any potential bias before the arbitration recognizing that parties in small industries may have relationship with either side. *Id.*

In evaluating the purported bias of an arbitrator, the Court looks at: (1) the financial interest the arbitrator has in the proceedings; (2) the directness of the alleged relationship between the arbitrator and a party to the arbitration proceeding; (3) and the timing of the relationship with respect to the arbitration proceeding." *Sanford Home for Adults v. Local 6, IFHP*, 665 F. Supp. 312, 320 (S.D.N.Y. 1987).

The American Arbitration Association Code "The Code of Ethics for Arbitrators in Commercial Disputes", effective March 1, 2004:

**CANON II:   An arbitrator should disclose any interest or relationship likely to affect the impartiality or which might create the appearance of partiality:**

A.  Persons who are requested to serve as arbitrators should, before accepting, disclose:

(1)  any known direct or indirect financial or personal interest in the outcome of the arbitration;

(2)  any known existing or past financial, business, professional or personal relationships which might reasonably affect impartiality or lack of independence in the eyes of the parties. For example, prospective arbitrators should disclose any such relationships which they personally have with any party or its lawyer, with any co-arbitrator, or with any individual whom they have told will be a witness. They should also disclose any such relationships with their families or

household members or their current employers, partners, or professional or business associates that can be ascertained by reasonable efforts;

(3)  the nature and extent of any prior knowledge they may have of the dispute; and

(4)  any other matters, relationships, or interests which they are obligated to disclose by the agreement of the parties, the rules or practices of an institution or applicable law regarding arbitrator disclosure.

B.  Persons who are requested to accept appointment as arbitrators should make a reasonable effort to inform themselves of any interests or relationships described in paragraph A.

C.  The obligation to disclose interests or relationships described in paragraph A is a continuing duty which requires a person who accepts appointment as an arbitrator to disclose, as soon as practicable, at any stage of the arbitration, any such interests or relationships which may arise, or which are recalled or discovered.

D.  Any doubt as to whether or not disclosure is to be made should be resolved in favor of disclosure.

***

See Exhibit 9.

Similarly, the ARAIS-US, *Code of Conduct – Canon IV, Disclosure*:  "Candidates for appointment as arbitrators should disclose any interest or relationship likely to affect their judgment.  Any doubt should be resolved in favor of disclosure."  See Exhibit 10.

Finally, Article 24 of Clash Catastrophe Treaty 0274/04, the Arbitration provision clearly states that the arbitrators "shall be active or retired **disinterested** executive officers of insurance or reinsurance companies or Lloyd's London Underwriters." [Emphasis added]  See Exhibit 6.

There is no doubt that based upon the law and the foregoing standards, Campos was required to disclosed his extensive business and financial relationships with the principals of ICA and the Players, prior to and during the arbitration, but did not do so. This lack of disclosure was

not inadvertent, but a concerted effort by ICA and Campos to corrupt the arbitration panel and commit a fraud on the arbitration process.

> 1. *Alex J. Campos' failure to disclose long-standing business and financial relationships with ICA and the principals of ICA are numerous and significant, resulting in an award that was obtained through corruption, fraud or undue means perpetrated by the Insurance Company of the Americas and Mr. Campos.*

Arbitrator Campos is the President and/or CEO and/or an executive and/or an executive consultant for *many, many* companies. See Exhibit 11.   As noted earlier, he is also the President/CEO of Vensure Employers and/or the Vensure group of companies.  Most if not all of these companies are run out of the same office space as ICA, that being the 4140 Mesa Address, i.e. the "store-front".  Campos is also the President and CEO of PC Processing, Inc., f//k/a PC General Agency, Inc. out of Duluth, Georgia.[9]  Although our investigation is on-going, to date, Underwriters have uncovered that his business and financial relationships with the ICA executives and the Players are extensive and include: Infinet, Human Dynamics Corporation, Vensure Employers, Vensure H.R. and Accelerated. There are other companies such as CompAlliance and Vensure Federal Credit Union ("Vensure FCU") that are also run out of the 4140 Mesa Address.  While these companies will not be discussed in detail in our Motion, we wish to point out to this Court that Vensure FCU involved the same Players and was subject to action and eventual liquidation by the National Credit Union Admiration ("NCUA").  As summarized in the attached article:

> The NCUA had warned Vensure in 2010 that it's reliance on Trinity posed a "strategic risk" to its future operations, should something (ahem) cause Trinity to go belly-up. In January 2011, the NCUA recommended Vensure immediately get out of the poker processing biz, but Vensure claimed its contract with Trinity required 180

---

[9] See, *United States Liab. Ins. Co. v. PC General Agency, Inc.*, 2009 U.S. Dist. LEXIS 26178 (D.C.N GA 2009) in which Campos' company, PC Holdings, Inc. was sued for Breach of Contract, Breach of Fiduciary Duty, Tortious Interference with Fiduciary Duty, Conversion regarding Mr. Campos' company's alleged co-mingling of funds and the failure to remit premium to the insurer.

days notice to cease processing the transactions. Following Black Friday and the freezing of Trinity's accounts, the NCUA claimed Vensure was "insolvent and has no prospects for restoring viable operations." In her decision, Collyer made no comment on whether or not Trinity "engaged in criminal behavior," but noted that since Vensure had failed to heed the NCUA's warnings, the credit union could not "cry wolf that they haven't been given that opportunity once the perfect storm happened."

See Exhibit 12.

As noted earlier, Mr. Hirst and First Florida purchased ICA from the State of Florida in 2009. According to www.corporationwiki.com, the officers and directors of First Florida included:

- Gary T. Hirst – Chairman/Director
- John C. Iorillo – Treasurer/Director
- Robert Morley – Director/President/Secretary

See Exhibit 13.

According to the January 4, 2011 Florida Profit Corporation Annual Report, filed by Ricardo Rios, the Treasurer and/or Chief Financial Officer of ICA, the "Current Principal Place of Business for ICA was 4140 E. Baseline Rd, Suite 201, Mesa, AZ  85206.  The 2012 and 2013 Florida Profit Corporation Annual Reports filed by ICA also listed the address as the 4140 Mesa Arizona Address.   The 2011, 2012, 2013 Florida Profit Corporation Annual Reports filed by ICA list the Officer/Director Detail of ICA to include the following individuals at the 4140 Mesa Arizona Address:

- John Iorillo, President, Director
- Gary Hirst, Chairman, Director
- Ricardo Rios, Treasurer, Secretary, Director

See Exhibit14.

With respect to Campos, ICA and related companies, the structure and the Players appears as follows:

A. **Accelerated** – *Manages the Vensure Group of Companies*[10]
  - Alex Campos, Member
  - John Iorillo, Member
  - Heather Iorillo (wife of John Iorillo)
  - Robert Morley (brother of Benton Morley)
  - Thomas Lindsay, Member

B. **Vensure Employers** – *Managed by Accelerated*
  - Alex Campos, President/*CEO*
  - John Iorillo- Chief Financial Officer
  - Heather Iorillo (wife of John Iorillo)
  - Ricardo Rios – Chief Financial Officer
  - Robert Morley
  - Benton R. Morley – National Claim Manager
  - Kyle Anderton – Executive
  - Thomas Lindsay – COO

C. **First Florida Equity Holdings** – *the Parent of ICA*
  - Gary T. Hirst – Chairman/Director
  - John C. Iorillo – Treasurer/Director
  - Robert Morley – Director/President/Secretary

D. **ICA** – *Run out of the same offices as Vensure Employers*
  - John Iorillo, President, Director
  - Gary Hirst, Chairman, Director
  - Ricardo Rios, Treasurer, Secretary, Director
  - Benton Morley – National Claims Manager

E. **Infinet/Human Dynamics**
  - Alex Campos (through PC Processing)
  - John Iorillo – Chief Financial Officer
  - Thomas Lindsay – Chief Operating Officer
  - G. Douglas Anderton
  - Jane Dow Anderton
  - Edward Kyle Anderton
  - Lori J. Anderton

F. **Vensure HR, Inc.**
  - Alex Campos
  - Thomas Lindsay
  - G. Douglas Anderton, Jr.

---

[10] See Exhibit 15.

The *Internal [Employee] Directory of Vensure Employers* (Campos' company) at the 4140 Mesa Address lists the following individuals as executives:

ACCELERATED
- *John Iorillo, President/CEO – ICA [Insurance Company of the Americas]*
- *Robert Morley, Outside Counsel*
- Tom Lindsay, Consulting COO

EXECUTIVE
- *Alex Campos, Managing CIO*
- Fletcher Anderton, Managing Director

See Exhibit 16.

The individual employee profiles listed on the *website of Vensure Employers* (Campos' company), lists the following ICA/First Florida (parent of ICA) persons as executives in his company:

- *Ricardo Rios – Chief Financial Officer*
- *Robert Morley – Executive – Outside Counsel, Accelerated*
- *John Iorillo – MGA: Accelerated*
- Tom Lindsay – Chief Operating Officer
- Fletcher Anderton

See Exhibit 17.

Underwriters also attach as Exhibit 18, the result of an internet search which further reveals seven (7) additional contacts linking Campos to ICA, Iorillo, Rios, Benton Morley and the Players.

At the May 11, 2015 Organizational Meeting, the Panel members were asked for their disclosures. When it was his turn to affirmatively make disclosures, Mr. Campos made none. When questioned, he stated the following:

> Mr. Campos:  My name is Alex Campos.
> I don't know anyone here except Mr. Hirst. I had some potential dealings with him about 10 years ago that never really materialized.

He had an associate that I was trying to deal with but it never went anywhere and other than that contact I don't have any other related contacts with Mr. Hirst.

Mr. Stalker:   Did you have any business relationships with ICA?

Mr. Campos:   No.

***

See Exhibit 19 Organizational Meeting Transcript pages 12 -13; 6-20.

There was no further disclosure by Campos.

On September 11, 2015, the parities exchanged potential witness lists.  ICA forwarded a witness list that included Ricardo Rios.  See Exhibit 20.  Again, there were no disclosures by Campos.  The parties exchanged Pre-Hearing Briefs and Replies.  On October 1, 2015, the Panel held a status conference with the parties.  Again, there were no disclosures by Campos.

The Arbitration Hearing commenced on October 5, 2015 and lasted until October 8, 2015, during which time evidence and witnesses were presented by ICA.  Mr. Rios, the Chief Financial Officer of Campos' company, Vensure Employers, sat at ICA's table and in front of Campos.  He was described as the Chief Financial Officer of ICA.  The Panel was asked for any supplemental disclosures. Campos said nothing.

Documents were also placed into evidence by ICA bearing the names of Ricardo Rios, John Iorillo and Benton Morley, all undisclosed executives of Campos' company, Vensure Employers.  During Day 1 of the Hearing, Rios' name was placed into the record five (5) times; Iorillo's name was placed into the record three (3) times; and Benton Morley once.  Incredibly, Campos made no disclosure.[11]

---

[11] If there is any doubt for the Court that Campos did not recognize Mr. Morley was, we attach for the Court an affidavit from Mr. Morley in a matter entitled *Patriot National Insurance Group, Inc., Guarantee Insurance Company and Ullico Casualty Company v. Vensure Employers, Inc.* (Campos' company).  The document is a Memorandum of Defendant/Counter Plaintiff. In his affidavit, Mr. Morley states that he has been the National

During Day 2, Rios, Mr. Campos' CFO, was sworn in and testified before the Panel as the CFO of ICA.   Again, there was no disclosure by Campos.

During Day 3, ICA placed claim notes into the record for the Arnold claim and the Kringel claim.  Benton Morley's name appears in these records **309** times; Iorillo's name **275** times and Rios' name **5** times.  Unethically, by any of the foregoing standards, Campos sat in stone-faced silence.

It strains credulity that Campos did not recognize his own CFO (Rios), his own President (Iorillo) and his own National Claims Manager (Benton Morley) as evidence and testimony was being presented during the Arbitration Hearing.

Under the law of this Court, the Code of Ethics of the American Arbitration Association, the Code of Conduct of ARIAS-US and Article 24 of the Clash Catastrophe Treaty, a reasonable person would conclude that Campos had an obligation to disclose, and that he was partial to ICA. *Applied Industrial*, 492 F.3d at 137.  The objective information available clearly demonstrates a significant overlap in the corporate executives of multiple parties which required disclosure by Campos. *Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 (2d Cir. 1986).

> **2.   *Campos also failed to disclose his significant business and financial relationships with ICA President John Iorillo and other interested Players at the 4140 Mesa Address storefront: In Re: Human Dynamic Corporation.***

From September <u>2001</u> to February <u>2003</u>, John Iorillo was the Chief Financial Officer for Infinet Holdings ("Infinet").  Thomas Lindsay[12] was the Chief Operating Officer of Infinet.  In <u>1993</u>, C. Douglas Anderton ("Doug") and his son, G. Douglas Anderton, Jr. ("Doug Jr.") established a subsidiary of Infinet called Human Dynamics Corporation ("HDC").  In 2003,

---

Claims Manager for Vensure Employers for approximately three (3) years.  It is the exact month that Mr. Morley followed up with Underwriters on the Arnold and Kringel claims for ICA. See Exhibit 21.

[12] We have been advised that Thomas Lindsay is related to the Anderton family.

Doug and Doug Jr. established Human Dynamic Captive Management ("HDCM"). Campos and his company, PC General Agency, Inc. [n/k/a PC Processing] were intimately involved with Infinet, HDC, HDMC, Iorillo, Lindsay and the Anderton family. In 2005, Doug filed for Chapter 11 bankruptcy for HDC. In 2007, several lawsuits were filed against HDMC, the Andertons and PC General Insurance Agency (**Campos' company**).

The situation is best described by an Order dated September 05, 2012 by Justice David G. Campbell of the United States District Court for the District of Arizona in which the underlying Bankruptcy Court found that Doug Anderton stole from millions HDC and Campos' involvement in the process:

### I. Background

In 1993, G. Douglas Anderton ("Doug Anderton") formed Human Dynamics Corporation ("HDC") to take advantage of business opportunities emerging in the professional employer organization industry. In 2003, Doug Anderton and his son, G. Douglas Anderton, Jr. established Human Dynamics Captive Management ("HDCM"), opened a bank account in HDCM's name, and used that account to steal over 4.2 million dollars in HDC's money. In 2005, Doug Anderton, filed Chapter 11 bankruptcy for HDC. The reorganized company – Reorganized Human Dynamics ("RHDC") – commenced several lawsuits in 2007 to recover the money Doug Anderton stole from HDC. Following a four day trial, the bankruptcy court entered judgment on November 18, 2011, holding Doug Anderton liable to RHDC for over 4.2 million dollars in fraudulent transfers, conversion, unjust enrichment, breach of fiduciary duty, breach of contract, and aiding and abetting. CV 11, Doc. 15-1, at 9-25. See Exhibit 22 page 2; 11-22.

\*\*\*

RHDC does not dispute that Infinet was the parent corporation, but that does not mean the money at issue belonged to Infinet. Both Doug Anderton and **John Iorillo**. Infinet's CFO from September 2001 to February 2003, testified at trial that all revenue was generated by Infinet's subsidiaries....See Exhibit 22 page 8; 20-23.

Defendants claim that both Dan Cheldin and **Alex Campos, a friend of Doug Anderton's and the owner of PC General Agency** ("PCGA"), testified that all but 70 of the 1,200 claims transferred as a result of the LPTA were administered and paid....See Exhibit 22 page 12; 24-27.

Judge Baum found that Doug Anderton caused HDCM to transfer a total of $1,283,396.11 to **PCGA**.  CV11, Doc. 15-1, at 18.  **PCGA** later transferred $150,000 back to HDCM and retained $9,836; the balance of the funds was transferred at Doug' Anderton's instructions to a bank account in Cost Rica. *Id.*

The bankruptcy court also found that Doug Anderton caused HDCM to transfer a total of $1,799,283.01 to Kyle Anderton's band account at Watermark Credit Union.  *Id.* at 18-19.  Kyle Anderton then transferred a total of $1,739,893.03 to the Costa Rican bank account.  See Exhibit 22; page 13; 7-13.

Judge Baum concluded as a matter of law that Kyle Anderton and **PCGA** were either immediate or mediate transferees of the fraudulently transferred funds of HDC, and that they took and had "dominion and control" over the HDC funds that were transferred to their accounts. [footnote omitted]  CV11, Doc. 15-1, at 22-23. See Exhibit 22 page 13; 18-21.

[Emphasis added]

During trial, **Campos** testified as follows:

Q.   What are your activities today?

A.   We are based in auto insurance in Duluth, Georgia, basically claims administration and policy administration.

Q.   What is the name of the company?

A.   We have **several companies** depending on the state.  We have **Map General Agency**.  We have **Lindsey General Insurance Agency**.[13]  So we have several of them.  And depending on the state that we do business in, they market through those names.

---

[13] Thomas Lindsay is/was a principal in the Lindsay General Insurance Agency and is one of the Players at the 4140 Mesa Address.  He also served as an executive on many of the co-mingled companies and was the President of Vensure FCU.

Q.   What is your position in those companies?

A.   Well, the main company that does most of the back office is called **PC General Agency** and recently got renamed to **PC Processing**. And I am the President and CEO of the company.

Q.   And that company is one of the defendants in this case?

A.   Yes

Q.   And you are here representing them today?

A.   Yes.

Q.   Okay.   Would you describe your business relationship with Douglas Anderton, please.

A.   Basically it – it – I met G. Douglas Anderton and Thomas Lindsey and the Infinet folks, back, I think, in 2000/2001.  And it was during a meeting that Seibels-Bruce – Seibels Bruce had reached out to me, I think it was Ken Marter. We were doing some back office work for Seibels-Bruce in the premium finance side of the house.  And I was approached by Ken Marter with this idea that they would like to see Seibels-Bruce and Infinet and **PC Group** – cause, you know, kind of like the umbrella of our company is called **PC Group** – potentially merge. He told us that, you know, Seibels-Bruce had a publicly traded stock, which was obviously advantageous, that Infinet had a substantial amount of top line earnings and that **PC Group** had a lot of technology and let's call it sizzle so that the market would receive us in a great way.  So they set up a meeting for all of us to meet in my offices in Duluth, Georgia.  And that's really when the genesis of most of my relationship with Mr. Anderton became.

Q.   And subsequently, did you enter into any business relationships with Mr. Anderton and Infinet?

A.   Yeah.  One of the things that we did is Infinet did some – or I guess one of the companies did some PEO work for us.   We also had some claim administration that we were going to undertake for them.

[Emphasis added]  See Exhibit 23 page 4-6:22-13.

Later, after testifying regarding personal/business loans he received from Mr. Anderton/HDC and wiring funds from the operation to Costa Rican banks, Campos stated under oath regarding Mr. Iorillo and Infinet:

Q.   When you were initially approached by Mr. Anderton and subsequently Mr. Cheldin, what kind of investigation did you do into their business history?

A.   Well, by the time that they approached me, I know Doug already for a while. I mean, we had met and talked about merger of our three companies with Seibels-Bruce.  So, you know, it's one of those things that, you know, you don't really revert everyone to me you're going to start a new transaction with them.  I felt comfortable with Doug and his operation.  I had met **Tom Lindsey**.   I had met some of their other senior guys, **John Iorillo**.  I had been out to their offices. They had been out to our offices a few times.  We were, you know, since we're a back office – excuse me.  Since we're a back office provider, we have a lot of technology and a lot of ability with programing.  One of the things I saw right away, you know, Infinet could use some automation, some additional automation. So I was pitching them on letting me do some software development for them.  So it was a fluid situation.  So I was approached on the back office claim, obviously I was approached by what I considered at the time people I knew and welcomed. Obviously, it was more business for us.

Q.   How important was it in your decision making that you already knew the people?

A.   It's important.  It's important… But again. I had comfortable feelings with **Infinet and Doug and his group**…..

See Exhibit 23 page 11-12; 12-11.

On cross-examination he testified as follows:

Q.   Mr. Campos, I want to talk for a moment about your relationship with Mr. Anderton.  You testified that you met him back in, I believe, it was 2000 or 2001. Correct?

A.   Yes.

Q.   And you talked about this potential roll up of these various companies related to the Seibels-Bruce Group.  Correct?

A.   Yes.

Q.   In addition to that transaction, you also helped Mr. Anderton with some litigation involving Frontier Insurance.  Correct?

A.   Yes.

Q.   And, in addition to that, you were involved with the Seibels-Bruce Group litigation pending in the state court in Arizona during 2002 to 2005.  Correct?

A.   When you say involved, I was deposed.

Q.   You were deposed.

A.   By your side, the Seibels-Bruce side.

Q.   Correct.  And, Mr. Campos, you also had discussions with Mr. Anderton and various principals of Infinet and the Infinet related companies about the litigation, didn't you?

A.   Yeah.  I was a witness to that because I think surrounding the Seibels-Bruce litigation, was the whole activity that took place when we were introduced to HDC and the fact that the principals at the time of Seibels-Bruce were basically trying to buy the company out from Charlie Powers.  And, you know – which ultimately led to their being fired.  So I believe that, you know, at least the Infinet guys saw me as an, you know, a very important witness to the things that occurred during that time that gave rise to Seibels-Bruce cancelling their workers comp policy.

**Q.   Well, isn't it true, Mr. Campos, as that litigation progressed, after the time that you were deposed as a witness, that you continued to consult with Mr. Anderton and other principles at Seibels – or excuse me, at Infinet about that litigation?**

**A.   Yeah.  I've had several conversations about that.  Again, because I –**

**Q.   You were –**

**A.   I was involved in the beginnings of what led up to that litigation.**

**Q.   Sure, Mr. Campos.  But you were also involved later on in that litigation with respect to funding part of that litigation, weren't you?**

**A.   I think there was some monies that were borrowed from one of our companies to fund that litigation.  That litigation got expensive for Doug. And so he was reaching out to continue to fund that litigation.**

Q.   And you were helping him with that.  Correct?

A.   With what?  With the funding –

Q.   Funding of that litigation.

A.   -- of the litigation?  Yes.

Q.   And you were involved in discussions with Infinet and HDC's counsel, Mike Lowe, also.  Correct?

A.   Yeah....

[Emphasis added] See Exhibit 23 page14-16: 20-23.

Thus, by any ethical standards, Campos had a long standing relationship with Iorillo (the President of ICA and the CFO of Infinet), Lindsay and the Andertons dating back to 2001.  His company received over $1.7 million in funds from these business partners, some of which he retained for his own account.  Campos even helped to finance the litigation in which they are still involved.  Campos disclosed none of this during the arbitration.  Campos also did not disclose that he and the same individuals were involved in separate but related litigation involving Seibels-Bruce and Frontier Insurance Company, which according to his sworn testimony, he was helping to finance.

Under *Sanford*, there can be no question (1) Campos had a financial interest in the outcome of this arbitration through his symbiotic relationship to ICA; (2) the relationships amongst the parties are involved and direct; and (3) the relationships were active and date back approximated fourteen (14) years.  As such, fairness warrants a vacatur of this decision.

**B.   THE AWARD MUST BE VACATED DUE TO CAMPOS' FAILURE TO DISCLOSE HIS LESS THAN STELLAR BACKGROUND IN THE FINANCIAL SERVICES INDUSTRIES WHICH RENDERS HIM UNFIT TO SERVE AS AN ARBITRATOR.**

*1.  Georgia Department of Banking and Finance*

Underwriters have also discovered that Campos and another one of his companies, One World Mortgage Corporation ("One World") was the subject of a cease and desist order ("Consent Order") dated May 28, 2009 with the Georgia Department of Banking and Finance. See attached the key terms of the Consent Order as See Exhibit 3.  The Consent Order involves

Campos' activities in the mortgage industry, i.e. the financial services industry, that being the same industry as insurance and reinsurance companies. Per the Consent Order, Campos was not allowed to supervise the activities of his company, One World, for a period of five (5) years regarding mortgage lending practices. For that same time period, Campos was not allowed to apply for a Georgia mortgage license or Georgia broker's lenders license, "except for any renewal he may have on behalf of One World".

***

### 2. Federal Deposit Insurance Company

In another matter, or about February 22, 2012, the Federal Deposit Insurance Company (FDIC) as the receiver of Washington Mutual Bank NA (WaMu) entered into a Settlement Agreement and Release with Alex Campos and One World Mortgage Corporation (One World) were as follows:

The allegations against Mr. Campos and One World were as follows:

1. On October 19, 2004, WaMu filed a lawsuit against Residential Lending Corporation, f/k/a Westminster Mortgage Corporation ("Residential") in the Federal District Court of South Carolina.

2. On October 14, 2005, the South Carolina Court entered a judgment against Residential in the amount of $3,975,448.51 (the "Judgment").

3. On October 23, 2008, following Residential's failure to pay, WaMu filed suit against Alex Campos and One World in the North District of Georgia (the "North Georgia Litigation").

4. One World is the alter ego of Residential and Campos is the alter ego of One World and Residential.

5. The FDIC took over WaMu as its Receiver and substituted in for WaMu in the North Georgia Litigation.

6. While denying any liability and/or wrongdoing, Campos and One World settled the matter for $3,975,448.51 on February 22, 2012.

### 1.     Other Litigation that Rendered Campos Unfit to Serve as an Arbitrator in the Arbitration.

As noted earlier, in the still active matter *IPA Holdings v. ICA, et al*, the "worthless" Vensure stock was the subject of litigation commenced by James Kernan through IPA Holdings. The allegations included actions by Iorillo, Rios and Robert Morley, all of whom are executives in his organization and "Players". *IPA Holdings v. ICA* long preceded this arbitration.  It strains any credulity that Campos did not know that the stock of his company was used as security for the trust(s) in question and that his executives were subject to a civil RICO action.

In addition, the allegations against Campos' company, P.C. Processing, regarding breach of fiduciary duty, tortious interference with fiduciary duty and conversion in *United States Liab. Ins. Co. v. PC General Agency, Inc*. [noted earlier] with respect to the alleged co-mingling of funds and failure to remit premium to insurer, rendered Campos unfit to serve as an arbitrator in the financial services industry.

 Finally, to the extent Campos was an executive in Vensure FCU, the actions of the NCUA against Vensure FCU regarding the funneling of illegal internet betting through Vensure FCU would render Campos unfit to serve as an arbitrator in this matter.

Campos had an obligation to disclose the extent of his involvement in the foregoing matters, each of which would render him unfit to serve as an arbitrator in the financial services industry.  According, the Final Award must be vacated due to Campos' lack of disclosure and his corruption of the process based upon the Federal Arbitration Act, the Code of Ethics of the American Arbitration Association, the Code of Conduct of Arias-US and Article 24 of Clash Catastrophe Treaty 0274/04.

C.  **THE ARBITRATION PROCEEDING VIOLATED FUNDAMENTAL FAIRNESS OF UNDERWRITERS BECAUSE THE PANEL FAILED TO STOP THE PROCEEDINGS TO ALLOW FOR THE PRODUCTION OF MATERIAL INFORMATION.**

Section 10(a) of the Act, 9 U.S.C. 10(a)(3) provides that a federal court may vacate an arbitration award if "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of the party have been prejudiced."

Although an arbitrator is not required to hear all the evidence proffered by a party, an arbitrator must give each of the parties to a dispute an adequate opportunity to present its evidence and argument. *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516*, 500 F.2d 921, 920 (2d Cir. 1974); *Cofinco, Inc. v. Bakrie & Bros., N.V.,* 395 F. Supp. 613m, 615 (S.D.N.Y 1975).   In *Cofinco*, the Court reversed an arbitration award where the panel did not hear evidence pertinent and material to the controversy in question, noting it made no difference if panel acted in neglectful disregard rather by explicitly refusing to hear evidence. *Id.* Furthermore, an arbitrator is required to grant the parties a fundamentally fair hearing. *Robbins v. Day*, 954 F.2d 679, 685 (11th Cir. 1992) (holding an arbitrator must "give each part the opportunity to present its arguments and evidence."   Vacatur is appropriate when the exclusion of relevant evidence "so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Newark Sterotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3rd Cir. 1968).

During the Organizational Meeting, the Panel ordered the following discovery from the parties the following documents to be produced regarding Treaty 0274/04 and predecessor Treaty 950010X:

The Umpire:

Okay.  First of all, we would like to – number one, is to obtain a history, a drafting and negotiation of the treaty from the first placement to the last treaty with Lloyd's.

Number two, for the same period as number one, that same history period, any other reinsurance treaty purchased by ICA and detail of any communications – I am sorry, of any commutations.

Number three, any regulatory reports that discuss the scope and quantum of the reinsurance arrangements both as to purchase and recoverability.

Number four, we would like to see the underlying analysis of the transfer or risk potential for treaty ending in 2004 and 2005.

Number five, any relevant documents or communications between the broker and ICA and/or Lloyd's related to their respective relationship not related to number two above.

See Exhibit 19 Organizational Meeting Transcript, pp. 54-55.

These documents were also requested in Underwriters' Document Requests 1, 5 and 8. See Exhibit 24.

While Mr. Kernan was listed as a potential witness for ICA, during Day 1 of the Arbitration Hearing, Underwriters and the Panel were advised that Kernan was not going to appear.  See Exhibit 25.  In fact, ICA through Gary Hirst, read into the record a letter from Mr. Kernan stating that he had a conflict in scheduling regarding other legal matters.  See Exhibit 25.

Then, late in the afternoon,  Kernan arrived at the Hearing.  Upon Kernan's arrival, ICA interrupted the testimony of Hirst and placed Kernan on the stand.  For the first time, *during the cross* of Mr. Kernan, it came to light that he had been subpoenaed by ICA to appear and was not asked to bring documents in his possession.  Neither the Panel nor counsel for Underwriters was supplied with a copy of the subpoena. Furthermore, on cross examination by Stalker, Kernan testified as follows:

Q.  Let me ask you a point of order.  You are here today, and we appreciate your testimony.  Were you ever asked to produce documents for this arbitration?

A.  No.

Q.  Have you produced documents for this arbitration?

A.  No.

Q.  Do you maintain any documents with respect to either treaty 274, 950010X and the broker Gresham with respect to those treaties?

A.  I can't answer that question.  I don't even recognize those numbers.  I'd have to go back and look at the records.  I believe that most of the records went to ICA.

Q.  Were any records maintained by Oriska?

A.  Sure, probably they were.

Q.  Do you know if Oriska was requested to produce these documents?

A.  No.  They were not requested to produce, as far as I know.  To my knowledge, no.

See Exhibit 26, page 215-216; 6-7.

Later, on cross with respect to an alleged communication that Mr. Kernan had with Mr.

[Ted] Davey, regarding a key communication with Ted, Davey, the reinsurance broker:

Q.  He wrote at the very bottom, "I hope this makes sense to you and I will call you at 12 midday."
Did you ever send a communication to Mr. Davey that you disagreed with his analysis of how the 2005 ICA Oriska contract worked?

A.  I called Mr. Davey in regard to what he said here, because he, Frank Brooks and I specifically talked to him about what he was setting forth here in relation to the business we wrote.  That's my answer.

Q.  Did you memorialize it in a note to your file?

A.  No, but I recall it.  There may be notes in the file.  I didn't look at the file.

Q.  You haven't produced your file?

A.  I wasn't asked to bring it.

34

See Exhibit 27, pages 268-269; 20-14.

Later, Kernan testified on cross:

Q.  My last question to you is that Underwriters did not ask you to come down here, did they?

A.  Pardon?

Q.  We didn't request you; you were asked by the folks at ICA.  Correct?

A.  No.  Actually, I got a subpoena to come here.

Q.  You got a subpoena.  Did the subpoena include that you should bring your records?

A.  It did not.

See Exhibit 28, pp. 281-282; 21-8.

It came to light during Mr. Kernan's testimony that he had communications regarding the formation and nature of Clash Catastrophe Treaty 0274/04 and the predecessor treaty (950010X) with Ted Davey, the broker who placed the treaty for ICA, the fundamentals of which go to the heart of the controversy.  Nevertheless, Kernan was never requested to produce those documents nor was he requested to bring those documents to the Arbitration Hearing.  As such, following Mr. Kernan's testimony, Underwriters moved to continue the Hearing, and requested the Panel to order Mr. Kernan and Oriska to produce the documents [previously ordered by the Panel at the Organizational Meeting and requested by Underwriters in their document requests].  Alternatively, Underwriters argued that the Hearing could continue, however, the documents should be produced and Underwriters reserved the right, pending review of the documents to continue the proceeding.

In response, counsel for ICA argued that under New York CPL, ICA was not required to provide Underwriters a copy of the subpoena and that Underwriters could have subpoenaed the

records in question when Underwriters received ICA's responses to their Document Requests on August 5, 2015.

In response to ICA and as explained to the Panel, Underwriters were not placed on notice that Mr. Kernan was going to testify pursuant to a subpoena and therefore did not have the opportunity to subpoena or have the Panel subpoena all documents in Mr. Kernan's and Oriska's possession to the Hearing.  Because Oriska was a named party under the contract and a corporate entity to Clash Catastrophe Treaty 0274/04, Underwriters argued, there was a duty to produce all documents from ICA, Oriska [and RCA].

The Panel ruled against Underwriters because the Panel wrongfully believed that Underwriters could have subpoenaed the documents directly from Mr. Kernan and Oriska (non-parties to the arbitration):

> Mr. Stalker, the panel has come to the consensus that we are going to deny your objection based upon the letter from Mr. Magliery dated August 5th, where he specifically, under general objections number 1, they objected to the discovery request to the extent it may seek information from companies other than ICA.
>
> Therefore, we feel they gave you ample time to respond in some manner to Mr. Magliery's letter and, if you didn't agree, you could have subpoenaed Mr. Kernan and/or his records and/or Oriska's records.
>
> So we feel you had the time to do that.
>
> Mr. Stalker:  I want to thank the panel for the consideration, and just for the record, I just note my exception, but we thank you for the consideration.

The ruling by the Panel is fundamentally flawed and unfair.  Firstly, both New York law and Section 7 of the FAA do not authorize an arbitration panel or counsel of an opposing party to compel pre-hearing document discovery from non-parties. In *Life Receivables Trust v. Syndicate 102*, 549 F.3d 210, 217 (2d Cir. 2008), the Second Circuit specifically held that Section 7 of the

FAA does not authorize pre-hearing discovery from non-parties to an arbitration.  Therefore, even if Underwriters or the Panel issued a subpoena on August 5, 2015, it was unenforceable.

Secondly, the subpoena issued to Mr. Kernan by ICA was issued on the day before the Hearing, copy of which was supplied to Underwriters and the Panel, upon request, after Kernan had testified.  While Underwriters do not concede that New York procedural law apply to the arbitration, the subpoena and the lack of notice to Underwriters was also contrary to NYCPLR 3017, NYCPLR 3107 and NYCPLR 3120.  The failure to provide Underwriters with the subpoena in advance of Mr. Kernan's testimony also violates the "honourable engagements" portion of Article 24.[14]

The foregoing was nothing more than "gamesmanship" by counsel for ICA and a misunderstanding of Section 7 of the FAA, the honourable engagements provision of the Clash Catastrophe Treaty and New York procedural law.  Accordingly, based upon the foregoing, the Final Award must be vacated because Underwriters were denied access to documents that were material to the case due to a flawed understanding of New York procedural law and Section 7 of the FAA.

## D.   THE   FINAL   AWARD   MUST   BE   VACATED   BECAUSE   IT DEMONSTRATES A MANIFEST DISREGARD OF THE LAW.

An arbitration award may be vacated if it found the arbitration acted in manifest disregard for the applicable law.  *Wilko v. Swan*, 346 U.S. 427 (1953).  While the doctrine of manifest disregard is "severely limited", the Courts have vacated some, part or all of an arbitration award where there was a blatant disregard for the applicable law.  *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998) (finding manifest disregard law, evidence or both because of great weight of evidence of age discrimination under ADA); *New York Telephone Co. v.*

---

[14] Article 24, the Arbitration provision of the Clash Catastrophe Treaty provides that "The Arbiters shall consider this Agreement as an honourable engagement rather than merely a legal formality...."

*Communication Workers of America*, 256 F.3d 89, 92-93 (2d Cir. 2001) (vacating portion of award ordering payments found to be illegal and contrary to public policy under Circuit precedent); *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) (vacating portion of arbitral award mandating punitive damages as contrary to New York Law prohibiting arbitrators from ordering punitive damages).

In determining an arbitrator's awareness of the law, the Courts impute only knowledge of governing law identified by the parties to the arbitration. *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 823 (2d Cir. 1997), cert. denied, 522 U.S. 1049, 139 L. Ed. 2d 639, 118 S.Ct. 695 (1998).

The Panel's decision must be overturned because it cannot be "rationally derived from the agreement between the parties or from the parties submissions to the arbitrators"; and the terms of the award are "completely irrational." *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp. 2d 631 (E.D. Pa. 2009) quoting *Mut. Fire, Marine & Inland Ins. Co. v. Norad Rein Co.*, 868 F.2d 52 (3d Cir. 1989). Furthermore, the Court may vacate an arbitrator's award that does not "draw its essence" from the contract. *Kaplan v. First Options*, 19 F.3d 1503, 1512 (3d Cir. 1994).

As noted earlier, Article 24, the Arbitration provision of Clash Catastrophe Treaty 0274/04 provides that "The Arbiters shall consider this Agreement as an honourable engagement rather than merely as a legal obligation and may abstain from following the strict rules of law." Courts have read honorable engagement clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate. *Banco de Sequros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 261 (2d Cir. 2003). While arbitrators are given broad discretion, "no court has held that such a clause [honourable engagement] gives arbitrators

authority to re-write the contract they are charged with interpreting." *PMA Capital Ins. Co.*, 659 F. Supp. 2d at 636; *See also Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (finding even where the arbitrator's authority is broad, it is not unlimited).  An arbitration award can be vacated as completely irrational for eliminating key provisions of a reinsurance agreement and awarding relief not sought, *PMA Capital Ins. Co.*, 659 F. Supp. 2d at 639.

Clash Catastrophe Treaty 0274 contains the following pertinent provisions which were ignored by the arbitration panel and are relevant for the remainder of this motion:

**AGREEMENT NUMBER: 0274/04**

**PER OCCURRENCE CLASH CATASTROPHE**
**EXCESS OF LOSS**

\*\*\*

This Agreement is to indemnify the Reinsured on respect of claims arising from their liability under business classified by the Reinsured as Workers' Compensation, ***subject to the terms, conditions and warranties contained herein***

**ARTICLE I**

\*\*\*

**Section A**
This Agreement is only to pay the excess of the Ultimate Net Loss of USD 1,000,000 ***each loss occurrence*** with a limit if liability to the Reinsurers of USD 1,500,000 ultimate net loss ***each loss occurrence.***

**Section B**
This Agreement is only to pay the excess of the Ultimate Net Loss of USD 2,500,000 ***each loss occurrence*** with a limit if liability to the Reinsurers of USD 2,500,000 ultimate net loss ***each loss occurrence.***

\*\*\*

## ARTICLE 5

### WARRANTIES

It is warranted that:
1) No loss or losses are recoverable under this Agreement unless there are two or more lives, with a minimum each life value of USD 750,000.
2) The maximum claim any one person shall not exceed USD 2,500,000 (including costs) or so deemed.

***

## ARTICLE 7

### DEFINITION OF LOSS OCCURRENCE/EVENT

The term "Loss Occurrence" as used in this Agreement shall mean any one disaster or casualty or accident or loss or series of disasters or casualties or accidents or losses *arising out of or caused by one event.*

[Emphasis added]  See Exhibit 6.

Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole. *See Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002); *see also W.W.W. Assoc. v Giancontieri*, 77 N.Y.2d 157, 162-163 (1990).  Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co*., 472 F.3d 33, 42 (2d Cir. 2006).  In New York, reinsurance contracts are governed by general contract principles, the terms of unambiguous contracts are enforced as written. *Christiana General Ins. Corp. of New York v. Great American Ins. Co.*, 070 F.2d 268, 274 (2d Cir. 1992).  Moreover, in interpreting Per Occurrence Clash Catastrophe Treaty 0274/04, it is proper for the Court to look at the title of the contract in interpreting the intent of the parties.  "Like other contracts, reinsurances may have terms supplied or interpreted by usage.  *Law of Reinsurance*, Strain, Thompson Reuters, 2010, Chapter 12:8, "Usage and Custom".

40

The Reinsuring Clause requires Underwriters "to pay the excess of the Ultimate Net Loss of USD 1,000,000 each loss occurrence" "Loss occurrence" requires that the "accident or loss or series of disasters or casualties or accidents or losses arising out of or caused by one event." ICA has admitted that the Kringel and the Arnold losses arise from separate loss occurrences. Therefore, pursuant to the clear and unambiguous language of Clash Catastrophe Treaty 0274, the Kringel and Arnold claims are not recoverable.

Moreover, Warranty 1 of the Clash Catastrophe Treaty states "No loss or losses are recoverable under this Agreement unless there are two or more lives, with a minimum each life value of USD 750,000." This warranty when read in conjunction with the Reinsuring Clause requires two (2) or more lives with a minimum value of $750,000 each life, be involved in the same loss occurrence. Finally, Warranty provides "The maximum claim any one person shall not exceed USD 2,500,000 (including costs) or so deemed."

In this instance, the decision of the panel in essence re-wrote the clear and unambiguous provisions of Clash Catastrophe Treaty 0274/04 to allow for recovery from separate loss occurrences. The Panel also disregarded the clear and unambiguous language of both Warranties provisions of the Clash Catastrophe Treaty. An arbitration award based on the interpretation of a contract is irrational if the award "does not draw in essence therefrom...and is in manifest disregard thereof." *Swift Indus., Inc. v. Botany Indus., Inc.*, 466 F.2d 1125, 1130 (3d Cir. 1972). Case law clearly provides that when an award is irrational and eliminates key provisions of an agreement, the award may be vacated by the Court.

IV.     **CONCLUSION**

Underwriters move this Court to:

1.      Vacate the Final Award;

2       Remand the arbitration proceedings to a new tribunal;

3.      Award Underwriters attorney fees and costs incurred in the underlying arbitration

proceedings due to the conduct of ICA and its party appointed arbitrator, Alex Campos; and

4.      Award Underwriters attorney fees and costs in bring this Motion to Vacate.


                                        Respectfully submitted,

                                        WEBER GALLAGHER SIMPSON
                                        STAPLETON FIRES & NEWBY

Dated: January 15, 2016

                                        By:

                                        Kenneth M. Portner, Esquire
                                        **Attorney for Petitioner,**
                                        **Certain Underwriting Members at**
                                        **Lloyd's of London**