UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CERTAIN UNDERWRITING MEMBERS AT LLOYDS OF
LONDON,

                 Petitioner,                     16-CV-323 (VSB)

-v.-

INSURANCE COMPANY OF THE AMERICAS,

                 Respondent.


- - - - -.- - -.- - - - -.- - - - - - - -.- - - - - - - - -.- - - - - -x
CERTAIN UNDERWRITING MEMBERS AT LLOYDS,
LONDON SUBSCRIBING TO TREATY NO. 0272/04


                  Petitioner,                     16-CV-374 (VSB)

-v.-

INSURANCE COMPANY OF THE AMERICAS,

                 Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### INSURANCE COMPANY OF THE AMERICA'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S MOTION TO VACATE AWARD IN  ICA I (CONSOLIDATED CASE NO. 16-CV-323 (VSB))


Philip J. Loree Jr. (PL-2213)
LOREE & LOREE
830 Third Avenue
Fifth Floor
New York, New York 10022
(646) 253-0560
(516) 627-1720 (alternative phone no.)
PJL1@LoreeLawFirm.com

ATTORNEYS FOR RESPONDENT
INSURANCE COMPANY OF THE AMERICAS

TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... i

INTRODUCTION ......................................................................................... 1

SUBJECT MATTER JURISDICTION............................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ............................................. 2

POINT I ....................................................................................................... 11

THE UNDERWRITERS' MANIFEST DISREGARD OF THE AGREEMENT AND
MANIFEST DISREGARD OF THE LAW ARGUMENTS ARE MERITLESS BECAUSE THE
ARBITRATORS INTERPRETED THE CONTRACT AND THERE IS A BARELY
COLORABLE BASIS FOR THE AWARD .................................................... 11

A.    Standard of Review........................................................................ 11

B.    The Arbitrators did not Exceed Their Authority by Manifestly Disregarding the
Treaties .................................................................................................... 12

C.    The Arbitrators did not Manifestly Disregard the Law...................................... 14

POINT II....................................................................................................... 15

THE UNDERWRITERS SECTION 10(A)(3) PREJUDICIAL PROCEDURAL MISCONDUCT
DEFENSE IS MERITLESS BECAUSE IT SIMPLY ATTEMPTS TO SECOND GUESS THE
ARBITRATORS' DISCRETION TO MAKE DISCOVERY DECISIONS............................ 15

THE UNDERWRITERS' EVIDENT PARTIALITY ARGUMENT IS MERITLESS BECAUSE
THE UNDERWRITERS CANNOT MEET THEIR HEAVY BURDEN TO DEMONSTRATE
THAT A REASONABLE PERSON WOULD HAVE TO CONCLUDE THAT MR. CAMPOS
WAS GUILTY OF EVIDENT PARTIALITY .................................................... 19

CONCLUSION................................................................................................ 22

TABLE OF AUTHORITIES

Cases

*., Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) ................................ 2, 3, 13

*American Postal Workers Union v. U.S. Postal Serv.*, 754 F.3d 109, 113 (2d Cir. 2014) 13

*Burton v. Bush*, 614 F.2d 389 (4th Cir. 1980) .......................................................... 19

*Feifer v. Prudential Ins. Co. of Am.* .......................................................................... 19

*Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008) ........................ 12

*Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011) ............................... 15

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104, 107 (2d Cir. 2013) ................................................................. 18

*Life Receivables Trust v. Syndicate 102 at Lloyd's, London*, 549 F.3d 210, 218 (2nd Cir., 2008) ................................................................ 20

*LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ...... 19

*Morelite v. N.Y.C. Dist. Council Carpenters*, 748 F.2d 79, 84 (2d Cir. 1984) ............... 22

*Oxford Health Plans LLC v. Sutter* ......................................................................... 13

*Sole Resort, S.A. de C. V. v. Allure Resorts Management, LLC,* 450 F.3d 100, 102 (2d Cir. 2007) ................................................................................ 3

*Stolt–Nielsen, S.A. v. AnimalFeeds Int'l*, 559 U.S. 662, 671 (2010) ............................ 13

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) .. 15

the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") ................................................................. 1, 2, 3

*Trustmark Ins. Co. v. John Hancock Life Ins. Co.*, 631 F.3d 869, 872 (7th Cir. 2011) (Easterbrook, J.) .......................................................... 21

*Wall Street Associates, L.P. v. Becker Paribas Inc.,* 27 F.3d 845, 849 (2d Cir. 1994) ... 13

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us*, 126 F.3d 15, 21-23 (2d Cir. 1997) ... 2, 3

*Zeiler v. Deitsch*, 500 F.3d 157, 164-65 (2d Cir.2007) ................................................. 3

Statutes

9 U.S.C. § 10(a)(3) ................................................................................................ 20, 21

9 U.S.C. § 10(a)(4) ................................................................................................ 20, 21

9 U.S.C. § 207 ............................................................................................................. 8

9 U.S.C. § 9 ................................................................................................................ 8

9 U.S.C. §§ 201, *et seq.* (2014) .................................................................................. 8

Other Authorities

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") .......................................................................................... 8

Convention, Art. V(1)(b)............................................................................... 21

Federal Insurance Office, U.S. Department of the Treasury, *The Breadth and Scope of the Global Reinsurance Market and the Critical Role Such Market Plays in Supporting Insurance in the United States* 1 (2014) (the "FIO Report"), https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/FIO%20-%20Reinsurance%20Report.pdf .................................................................. 12, 30

the "Convention") ........................................................................................ 8

**INSURANCE COMPANY OF AMERICAS' MEMORANDUM
OF LAW IN OPPOSITION TO THE FIRST AND SECOND
LAYER UNDERWRITERS' MOTION TO VACATE AWARD**

## INTRODUCTION

Respondent Insurance Company of the Americas ("ICA") respectfully submits this memorandum of law in opposition to Petitioner's motion to vacate the arbitration award (the "Award") at issue in this proceeding. It submits a separate memorandum of law in support of its cross-motion to confirm the Award against Petitioner. ICA respectfully requests that the Court deny Petitioner's motion to vacate in its entirety, grant ICA's cross-motion in its entirety and issue an order and judgment confirming the Award against Petitioner.

## SUBJECT MATTER JURISDICTION

Respondent ICA is an insurance company organized under the laws of Florida, with its principal place of business in Florida. The Petitioner, Certain Underwriters at Lloyd's of London (the "First and Second Layer Underwriters") are a group of Lloyd's Underwriters that participated in a London-Market placed reinsurance treaty, which contains a written arbitration agreement that contemplates arbitration taking place in the United States. The Award arose out of an arbitration hearing held in New York City in the Borough of Manhattan.

The First and Second Layer Underwriters are seeking to vacate the Award, which falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), and the provisions of Chapter 2 of the Federal Arbitration Act (the "FAA"), which implement the Convention. *See* 9 U.S.C. §§ 201, *et seq.* (2014). ICA cross-moves to confirm the Award under 9 U.S.C. § 9 and 9 U.S.C. § 207.

The Award, although made in the U.S., is not entirely domestic in scope

because each of the Third Layer Underwriters are, upon information and belief, domiciled and resident in the United Kingdom, which, like the United States, is a signatory to the Convention. *See, e.g., Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us*, 126 F.3d 15, 21-23 (2d Cir. 1997).

The Court has original subject matter jurisdiction over proceedings involving awards or agreements that fall under the Convention, irrespective of the amount in controversy. 9 U.S.C. § 203 (2014). The petition concerns an award falling under the Convention and is thus an action or proceeding falling under the Convention over which this Court has original jurisdiction. *See, e.g., Scandinavian Re*, 668 F.3d at 71; *Sole Resort, S.A. de* C. *V. v. Allure Resorts Management, LLC,* 450 F.3d 100, 102 (2d Cir. 2007); *Zeiler v. Deitsch*, 500 F.3d 157, 164-65 (2d Cir.2007)

Because the Award was made in the U.S. the domestic provisions of Chapter 1 of the FAA "also apply, as is permitted by Articles V(1)(e) and V(2) of the. . . Convention." *Scandinavian Re*, 668 F.3d at 71; *Deitsch,* 500 F.3d at 164; *see also Yusuf Ahmed Alghanim* & *Sons,* 126 F.3d at 21-23.

## BACKGROUND AND PROCEDURAL HISTORY

The pertinent facts are set out in the Certifications of Gary T. Hirst executed on February 26, 2016 (the "ICA I Hirst Cert."), and are summarized below:

ICA is a Florida corporation with its principal place of business in Florida. ICA, a privately-held stock corporation, was licensed to write surety and workers compensation insurance in the State of Florida, although it does not currently hold an active certificate of authority in Florida. ICA currently holds or has held certificates of

2

authority to write insurance in a number of states; however, ICA has never held any authority to write insurance, been registered in, or written any insurance in New York State.

Since, at the latest, May 18, 2009 ICA has not done or transacted any business in New York. The only connection ICA has had with New York since 2009 has its agreement to hold the arbitration that is the subject of this proceeding in New York and its attendance and participation at the arbitration hearings.

This proceeding arose out of a dispute between ICA and its London Market Underwriters participating in two reinsurance treaties (the "Treaties"): (a) Treaty No. 0274/04 (the "First and Second Layer Underwriters"); and (b) Treaty No. 0274/04 (the "Third Layer Underwriters"). As the U.S. Department of Treasury recently described it, "[r]einsurance is a contract of indemnity between commercial parties – an insurer (i.e., the 'cedent' or 'ceding insurer') and one or more 'assuming insurers' (i.e., underwriters) – by which, in exchange for a premium, a specified portion of the risks under one or more insurance policies written by the cedent are transferred ('ceded') to the reinsurers."  Federal Insurance Office, U.S. Department of the Treasury*, The Breadth and Scope of the Global Reinsurance Market and the Critical Role Such Market Plays in Supporting Insurance in the United States* 1 (2014) (the "FIO Report"), https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/FIO%20-%20Reinsurance%20Report.pdf (last checked 2/26/2016). Reinsurance treaties are "standing reinsurance agreement[s]: in exchange for an agreed premium, a treaty covers a class of insurance risks specified in the contract." FIO Report at 8.

The Treaties are excess-of-loss treaties, that is, a form of nonproportional reinsurance which protects against losses "sustained above a predetermined and

stated threshold, known as the cedent's 'retention.'" FIO Report at 10. Part A of Treaty 0274/04 provided ICA with reinsurance in the amount of $1.5 million per occurrence in excess of $1 million per occurrence (i.e., the First Layer). Part B of that Treaty provided reinsurance in the amount of $2.5 million per occurrence excess of $2.5 million per occurrence. Treaty No. 0272/04 provided reinsurance in a maximum amount of $5 million per occurrence excess of $5 million per occurrence, the Third Layer. (ICA I Hirst Cert., Exs. A & B)

Both Treaties contain a materially identical arbitration agreement, which provides:

> As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising with respect to this Agreement, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration. One Arbiter shall be chosen by the Reinsured, the other by the Reinsurer, and an Umpire shall be chosen by the two Arbiters before they enter upon arbitration, all of whom shall be active or retired disinterested executive officers of insurance or reinsurance companies or Lloyd's London Underwriters. In the event that either party should fail to choose an Arbiter within thirty (30) days following a written request by the other party to do so, the requesting party may choose two Arbiters who shall in turn choose an Umpire before entering upon arbitration. If the two Arbiters fail to agree upon the selection of an Umpire within thirty (30) days following their appointment, each Arbiter shall nominate three candidates within ten (10) days thereafter, two of whom the other shall decline, and the decision shall be made by drawing lots.

> Each party shall present its case to the Arbiters within thirty (30) days following the date of appointment of the Umpire. The Arbiters shall consider this Agreement as an honourable engagement rather than merely as a legal obligation and they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of the Arbiters shall be final and binding on both parties; but failing to agree, they shall call in the Umpire and the decision of the majority shall be final and binding upon both parties. Judgment upon the final decision of the Arbiters may be entered in any court of competent jurisdiction.

> If more than one Reinsurer is involved in the same dispute, all such Reinsurers shall constitute and act as one party for purposes of this Article and communications shall be made by the Reinsured to each of the Reinsurers constituting one party, provided, however, that nothing

herein shall impair the rights of such Reinsurers to assert several, rather than joint, defences or claims, nor he construed as changing the liability of the Reinsurers participating under the terms of this Agreement from several to joint.

Each party shall bear the expense of its own Arbiter, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration. In the event that the two Arbiters are chosen by one party, as above provided, the expense of the Arbiters, the Umpire and the arbitration shall be equally divided between the two parties.

Any arbitration proceedings shall take place at a location mutually agreed upon by the parties to this Agreement, but notwithstanding the location of the arbitration, all proceedings pursuant hereto shall be governed by the law of the state in which the Reinsured has its principal office.

(ICA I Hirst Cert., Ex. A, Art. 24; Ex. B, Art. 24)

The dispute arose out of two workers' compensation claims, one of which, the Kringel claim, involved a sixteen-year-old who was sustained catastrophic brain injuries because a diving accident resulted in his brain being totally deprived of oxygen for five minutes leaving him with among other things, a severe case of epilepsy, an inability to communicate, and a need for life-long 24-7 care. (See Certification of Gary T. Hirst, executed on February 19, 2016, in *Certain Underwriters at Lloyd's, London Subscribing to Treaty No. 0272/04 v. Insurance Co. of the Americas*, No. 16-CV-374 ("ICA II") ("ICA II Hirst Cert., ¶12, ICA II Dkt. 17. ICA has paid approximately $4 million and if Mr. Kringel survives as long as he is expected to, then ICA will have to pay approximately $7.5 million more. (ICA II Hirst Cert. at ¶14, ICA II Dkt. 17) And once ICA's additional, future payments exceed $1 million, then the Third Layer Reinsurers will have to begin paying their respective shares of the claim. (ICA II Hirst Cert., ¶¶14, 16, ICA II Dkt. 17.)

The other claim, the Arnold claim, concerned an employee who was gravely injured at a construction site when a stack of dry wall toppled over and struck him.

ICA paid $1,007,842.57 for that claim, which is now closed, and will not likely generate any substantial additional payments. (Hirst Cert., ¶15)

The dispute between ICA and the First, Second and Third layer underwriters was essentially one of contract interpretation. The Underwriters claimed that the Treaties conditioned coverage on whether there were two claimants with injuries in excess of $750,000 *arising out of the same loss occurrence*, while ICA argued that the only condition for coverage was that there were two claimants with injuries in excess of $750,000 who were injured during the period covered by the Treaties. (ICA II Hirst Cert. at ¶¶19-20, ICA II Dkt. 17.)

Although ICA has satisfied its obligations to its insureds and injured employees, and in Mr. Kringel's tragic case continues to meet them, the First and Second Layer Underwriters refused to pay their respective shares of those claims, and the Underwriters participating in Treaty 0272/04 anticipatorily breached their obligation to pay claims in the (highly likely) event that Mr. Kringel's paid loss will exceed $5,000,000. (ICA II Hirst Cert. ¶16, ICA II Dkt. 17.)

Those breaches prompted ICA to demand arbitration on December 23, 2014. The demand sought arbitration "pursuant to the arbitration provision contained in Article 24 of that certain first and second layer reinsurance treaty brokered by Gresham Insurance Brokers Limited ("Gresham"), Agreement Number 0274/04, as extended and renewed ("Treaty") (as well as [in Article 24 of a third layer treaty contained in Agreement Number 0272/04, should the Claim rise to that level)." A true and correct copy of the Arbitration Demand is attached as Ex. C to the ICA I Hirsh Cert.

ICA appointed Alex Campos as its party-appointed arbitrator, and on January 16, 2015, the Underwriters appointed Trevor Clegg as its party-appointed arbitrator. (ICA I Hirst Cert., Exs. C & D) The two party-appointed arbitrators appointed Ben F. Hernandez as the umpire. An organizational meeting was held on May 11, 2015 in the City of New York, Borough of Manhattan. (A copy of the transcript of the organizational meeting (in minuscript form) is attached as Ex. E to the ICA I Hirst Cert.)

ICA's Chairman, Director and Chief Investment Officer, Gary T. Hirst, attended the Organizational Meeting on behalf of ICA, along with ICA's lead arbitration counsel, John Magliery, and his colleague, Julie Martin. No one else attended from or on behalf of ICA.

At the Meeting, the Arbitrators made disclosures, and for his part, Mr. Campos explained:

> ·I don't know anyone here except ·for Mr. Hirst.·I had some potential ·
> ·business dealings with him about ten years ago that never really
> ·materialized. He had an associate that I was trying to do a deal with but
> it never went anywhere and other than that contact I don't have any
> other related contacts with Mr. Hirst.

(Organizational Meeting Tr., ICA I Hirst Cert., Ex. E at 12) When asked by counsel for Underwriters to elaborate, explained further:

> There was going to be an investment by someone that I think Gary Hirst
> knew. · I don't remember the name of the person at the time but we, you
> know, looked at some due diligence and it just never materialized. · There
> was never -- don't even think it got to contracts but it just never closed.

(ICA I Hirst Cert., Ex. E at 12-13)

In addition, Mr. Campos, also in response to questioning by Underwriters' counsel, said that he had no business relationships with ICA, or ICA's predecessor,

Oriska Insurance Co. ("Oriska"), or RCA Reinsurance Corp. ("RCA"), an affiliate of Oriska; that he "did not work" for the "principals" of Oriska or RCA; and that the prospective piece of business we worked together on had been about 10 years ago. (ICA I Hirst Cert., Ex. E at 12-13)

On October 5, 2015 through October 8, 2015 the Panel convened a four-day arbitration hearing, which also took place in Manhattan, and at which the Panel heard testimony and argument presented by both parties, which was recorded in a 1,049-page hearing transcript. (See ICA I Hirst Cert., Ex. F (copy of transcript in minuscript form)

At the hearing ICA was represented by John Magliery, Esq. of Johnson Gallagher Magliery LLC and the Underwriters were represented by Timothy Stalker, Esq. of Weber, Gallagher, Simpson, Stapleton, Fires & Newby LLP. (Hirst ICA II Cert. at Ex. E, Tr. at 1-4: 2, ICA II Dkt 17) At the hearing, the Umpire, Mr. Hernandez, and ICA's party-appointed arbitrator, Mr. Campos, asked questions concerning whether the relief ICA was requesting would address what might happen should future payments on the Kringel claim, combined with the approximately $4 million already paid, exceed $5,000,000, and thus trigger the Third Layer Underwriters' obligations to reimburse ICA. (See Hirst Cert., Ex. D, Tr. at 941-44: 941-44.) Mr. Magliery pointed out that ICA had demanded arbitration under both Treaties, and that ICA was requesting declaratory relief concerning the Third Layer Underwriters' obligation to pay in the event total payments on the Kringel claim exceeded $5 million:

> MR. MAGLIERY:  Mr. Hernandez, we actually are [requesting relief to
> address expected future claim payments]. If you look at our demand for
> arbitration, we have demanded arbitration under treaties 0274 and
> 0272, the 5 to $10 million layer.   And the Underwriters, I take it, are
> defending that claim.   But we introduced the [0272] treaty in Mr. Hirst's

direct, and we will expect a declaration that should the claim achieve that level, it will be paid.

(Hirst ICA II Cert. at Ex. D, Tr. at 941-42: 942; ICA II Dkt. 17) The Underwriters'

counsel agreed with ICA's assessment of the situation:

> ·MR. STALKER: Correct. If you are successful, as you pay the claim, you would be reimbursed.
>
> MR. MAGLIERY: Mr. Stalker evidently has the same understanding.

(Id.)

On October 19, 2015, after hearing the parties' evidence and arguments, and deliberating among themselves, the Panel rendered the Award, which it delivered to the parties on October 21, 2015. (A copy of the Award is attached as Ex. E to the Hirst Cert.)

The Award represented the Arbitrator's interpretation of the Treaties, which was in accord with ICA's interpretation. It found the Underwriters participating in Treaty 0274/04 liable for, and granted to ICA damages of, $2,507,872.57 less an offset of $978,280.24 for reinstatement premium, which resulted in a net award of $1,529,592.30 (the "Damages"). (Award, Hirst Cert., Ex. E, at 2, ¶¶ 5 & 7)

The Award provided declaratory relief to ICA as respects the Underwriters participating in Treaty 0272/04: "[I]n the event that the Kringel claim exceeds $5,000,000, Underwriters shall pay losses submitted in excess of $5,000,000, through and including $7,500,000 (as limited by warranty I of Article 5 of the 0272/04 Treaty, which provides that the maximum claim per person shall not exceed $2,500,000)." (Award, ICA I Hirst Cert., Ex. G at 2, ¶ 6)

The Award also provided for a reinstatement premium offset for the Treaty 0272/04 reinsurers: "the award for 0272/04 Treaty shall be offset (pursuant to Article

9

11 and Article 9) by reinstatement premium due of $487,500 (the "Reinstatement"), based upon the Kringel claim, should the Kringel claim reach full loss settlement[,]" and the Panel set forth its calculation of that reinstatement premium amount. (Award, ICA I Hirst Cert., Ex. G at 2, ¶ 8)

The Award found Underwriters liable for, and granted to ICA, interest on the Treaty Damages at the annual rate of 4.5%, calculated daily from April 24, 2013 until paid. (Award, ICA I Hirst Cert., Ex. G, at 2, ¶ 9)

The Award stated that Underwriters should pay the Treaty Damages within forty-five days of October 19, 2015, i.e., by December 3, 2015.  The Underwriters have failed and refused to pay any portion of the Treaty Damages.

On January 14, 2016 the First and Second Layer Underwriters, represented by Mr. Stalker, filed a motion to vacate the Award, which it delivered to ICA's arbitration counsel on January 15, 2016.  The First and Second Layer Underwriters' are seeking vacatur of the Award on the alleged evident partiality of Mr. Campos, ICA's party-appointed arbitrator; the Panel's alleged exceeding of its authority by adopting the ICA's interpretation of the contract rather than that of the underwriters; and the "misconduct" the Panel allegedly committed by denying it all the discovery it sought.

10

**ARGUMENT**

**POINT I**

**THE UNDERWRITERS' MANIFEST DISREGARD OF THE AGREEMENT AND MANIFEST DISREGARD OF THE LAW ARGUMENTS ARE MERITLESS BECAUSE THE ARBITRATORS INTERPRETED THE CONTRACT AND THERE IS A BARELY COLORABLE BASIS FOR THE AWARD**

### A. Standard of Review

Section 10(a) of the Federal Arbitration Act permits vacatur on four exceedingly narrow grounds, specifically, where: (a) "the award was procured by corruption, fraud, or undue means" (9 U.S.C. § 10(a)(1)); (b) "there was evident partiality or corruption in" any of the arbitrators (9 U.S.C. § 10(a)(2)); (c) "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced" (9 U.S.C. § 10(a)(3)); or (d) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" (9 U.S.C. § 10(a)(4)). The U.S. Supreme Court has held that these four statutory grounds are exclusive in FAA-governed cases, and cannot be expanded by party agreement. *See Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008).

The FAA imposes a "strong presumption in favor of enforcing arbitration awards" under which an "award is [deemed] valid and unless it is proven otherwise." *Wall Street Associates, L.P. v. Becker Paribas Inc.,* 27 F.3d 845, 849 (2d Cir. 1994). Judicial review is "severely limited" "so as to not frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Re*, 668 F.3d at 71-72 (citations and quotations omitted). The challenger

11

must prove that one of the grounds for vacatur exists and the burden is a "heavy" one. *Id.* (citations and quotation omitted)

## B. The Arbitrators did not Exceed Their Authority by Manifestly Disregarding the Treaties

Where, as here, the challenger is asking the Court to vacate the Award because the arbitrators exceeded their powers under Section 10(a)(4) by allegedly manifestly disregarding the parties' agreement, it "bears a heavy burden[.]" *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (citation and quotation omitted). An award may be vacated "under the excess-of-powers standard.  .  .  only in the narrowest of circumstances." *American Postal Workers Union v. U.S. Postal Serv.*, 754 F.3d 109, 113 (2d Cir. 2014) (citation omitted). "It is not enough" for the challenger to "show that the [arbitrator] committed an error—or even a serious error." *Stolt–Nielsen, S.A. v. AnimalFeeds Int'l*, 559 U.S. 662, 671 (2010); *accord Oxford*, 133 S. Ct. at 2068.

The question before the Court is not whether the arbitrators "got.  .  .  [the contract's] meaning right or wrong[,]" but whether they interpreted it at all. *Oxford*, 133 S. Ct. at 2068, 2071. When parties agree to arbitrate they bargain for the arbitrators' construction of the contract, not that of a Court. *See Oxford*, 133 S. Ct. at 2070. As long as "the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* (quotation and citation omitted). The Panel's "construction holds, no matter how good, bad or ugly." *Oxford*, 133 S. Ct. at 2071.

Accordingly, "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." *Oxford*, 133 S. Ct. at 2068. An arbitration award may be overturned "[o]nly if the arbitrator acts[s]

outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract. . . ." *Id.* at 2068 (citations, quotations and brackets omitted)

The Underwriters do not come close to meeting this standard. They simply repeat to this Court their construction of the contract and claim that their construction is the only reasonable one, and that the Court should thus substitute the Underwriters' construction of the contract in place of the arbitrators' construction. But that's not how arbitration works, and for good reason. If arbitration awards were subject to the type of appellate review that the Underwriters request, then arbitration would be prohibitively expensive, and few would select it as an alternative to litigation.

Both parties had a full and fair opportunity to vet their respective interpretations of the contract to the arbitrators, and they both took advantage of that opportunity and extensively argued those interpretations to the arbitrators. (See, e.g., Hearing Tr., Parties Opening and Closing Statements) The Panel heard those arguments and the evidence adduced to support them and issued the Award, which, as discussed in the Statement of Facts, above, interpreted and applied the Treaties, making reference to various provisions of them, and calculating amounts due, and offsets against those amounts, in the form of reinstatement premium calculations – all of which were based on and derived from the Treaties.

There is simply no basis for the Underwriters to claim that the Award was not at least arguably an interpretation of the contract, and the Underwriters make no such argument. Accordingly the Court should reject the Underwriters' manifest disregard of the agreement argument.

### C. The Arbitrators did not Manifestly Disregard the Law

The Second Circuit continues to recognize a "judicially created ground" for vacatur called "manifest disregard of the law." *See Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011) (citation omitted). This ground, not unlike Section 10(a)(4)-based manifest disregard of the agreement, is "consistently accorded the narrowest of readings." *Jock*, 646 F.3d at 122. As long as there is a barely plausible basis for the outcome, then the award must stand. *Id.*

Manifest disregard of the law can be invoked "only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010). Legal errors, "misunderstanding[s] with respect to the law," "arguable difference[s] regarding the meaning or applicability of lawsn urged upon" the arbitrators," do not demonstrate manifest disregard of the law. *Id.*

A challenger seeking to invoke manifest disregard of the law must show that: (a) "the governing law alleged to have been ignored by the arbitrators was well defined, excplicit, and clearly applicable[;]" and (b) "the arbitrator knew about the existence of a clearly governing legal principle, but decided to ignore it or pay no attention to it." Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 452 (2d Cir. 2011) (citation omitted).

The Underwriters also fall far short of satisfying the very demanding manifest disregard of the law standard. The dispute before the Panel was all about contract interpretation. It did not turn on some overriding, clearly applicable legal principle, let alone one about which the Underwriters claim to have informed the Panel, and which the Panel somehow disregarded. Furthermore, the Underwriters have not demonstrated, or even attempted to demonstrate, that the arbitrators are guilty of

14

some "egrigious iompropriety" by allegedly disregarding the law.

The Underwriters' manifest disregard of the law claim must therefore fail.

**POINT II**

**THE UNDERWRITERS SECTION 10(A)(3) PREJUDICIAL PROCEDURAL MISCONDUCT DEFENSE IS MERITLESS BECAUSE IT SIMPLY ATTEMPTS TO SECOND GUESS THE ARBITRATORS' DISCRETION TO MAKE DISCOVERY DECISIONS**

The Underwriters assert that the Panel somehow committed procedural "misconduct" or "misehavior" under Section 10(a)(3) of the FAA because:

1. The Panel allegedly ordered the parties to produce in discovery certain categories of documents, some of which the Underwriters belatedly claimed were not produced.

2. During discovery, the Underwriters requested that the same documents be produced, but ICA objected to those requests prior to the hearing. .

3. Underwriters do not say when they realized that they had not obtained everything they thought they needed in discovery.

4. At the hearing, a third party witness, Mr. Kernan, who was a former officer, director and principal of ICA, did not bring with him any documents when he showed up to testify, something that comes as no surprise since neither party asked him to bring any documents to the hearing.

5. The Underwriters then requested the Panel to order ICA to produce the docucments because neither ICA nor the Underwriters asked Mr. Kernan to produce the documents. In addition, the Underwriters sought to adjourn the hearing to permit the documents to be produced and reviewed. .

15

6. The Panel, faced with an eleventh hour request during the arbitration hearing, for documents that the Underwriters could have taken steps to obtain several weeks or even months ago, denied the request. They did so because of the belated  nature of the request, which the Panel concluded the Underwriters could have made, if necessary, by a timely panel subpoena directed to Mr. Kernan.

The Underwriters assert that the Panel has committed procedural misconduct by not ordering the documents produced and adjourning the hearing. Specifically, they assert that the Panel's rationale for denying  the stay and not ordering the belatedly requested discovery was predicated on the Panel's "misunderstanding" the law concerning the use of arbitral subpoenas to obtain documents from third-party witnesses. According to the Underwriters, they could not have subpoenaed the documents.

Section 10(a)(3) does not authorize vacatur of an arbitration award in these circumstances. Section 10(a)(3) of the FAA provides (with bracketed numbering

text added for clarity):

[An arbitration award may be vacated:]
where the arbitrators were guilty [(1)] of misconduct [(a)] in refusing to postpone the hearing, upon sufficient cause shown, or [(b)] in refusing to hear evidence pertinent and material to the controversy; or [(2)] of any other misbehavior by which the rights of any party have been prejudiced[.]

9 U.S.C. § 10(a)(3).

Section 10(a)(3)'s touchstone is whether the alleged misconduct or misbehaviour prejudiced the award challenger so that it was denied a "fundamentally fair hearing." *See, e.g.,* 9 U.S.C. § 10(a)(3); *Kolel Beth Yechiel Mechil of Tartikov, Inc. v.*

16

*YLL Irrevocable Trust*, 729 F.3d 99, 104, 107 (2d Cir. 2013) (internal quotation marks omitted); *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 975 (2d Cir. 1974). ]

Where as here, the challenger asserts that the arbitrators improperly excluded evidence, denied it discovery, restricted the number of witnesses it could call, or decided to terminate the hearing earlier than expected, the challenger has at least as heavy a burden as it has to convince a court that the outcome of the arbitration is in manifest disregard of the law or contract. "Arbitrators have substantial discretion" to make decisions about the admissiblity of evidence or the scope of discovery. *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013); *Kolel*, 729 F.3d at 107. Because arbitration hearings are supposed to be summary and expeditious, arbitrators are not required to hear testimony, *Kolel*, 729 F.3d at 107, and parties who agree to arbitrate necessarily sacrifice some of the "procedural nicities" of litigation, including "the right to pre-trial discovery." *See, e.g., Burton v. Bush*, 614 F.2d 389 (4th Cir. 1980). That is especially so where, as here, the Panel was presented with a question of "contract interpretation, which is a question of law and would not necessarily require reference to external evidence." *Kolel*, 729 F.3d at 107 (citing *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir.2002)) (quotations omitted).

The Underwriters do not  come even close to meeting their burden to demonstrate that they were denied a fundamentally fair hearing, nor could they in the circumstances here. First, the Underwriters have only themselves to blame for having not moved in a more expeditious fashion to obtain the disputed discovery. For example, had they applied during the discovery period for relief, then perhaps the Panel might have been more inclined to give it to them.

17

Second, the Underwriters' contention that they could not have used an FAA Section 7 procedure to obtain the documents is inaccurate. While the Second Circuit has held that Section 7 does not, without more, permit arbitrators to issue discovery subpoenas enforceable against a nonparties, "it does not leave arbitrators powerless to order the production of documents[:].  .  . .arbitrators may, consistent with section 7, order 'any person' to produce documents so long as that person is called as a witness at a 'hearing.'" a" hearing." *Life Receivables Trust v. Syndicate 102 at Lloyd's*, *London*, 549 F.3d 210, 218 (2nd Cir., 2008) (quotations and citations omitted). The Second Circuit also noted that "[a]rbitrators also have the power to compel a third-party witness to appear with documents before a single arbitrator, who can then adjourn the proceedings." Id. (quotations and citations omitted).

There is no evidence that the Underwriters made any attempt to subpoena Mr. Kernan through the procedure outlined in *Life* Receivables, even though Underwriters rely on that case to support their argument. Had they made such a request to the Panel in a timely fashion, they might have obtained the documents they think they needed. Their failure to act to protect their own procedural rights negates their argument that they were denied a fundamentally fair hearing. *See, e.g., LJL 33rd St. Assocs.,* 725 F.3d at 194 (challenger could have avoided exclusion of evidence by relying on witnesses rather than exhibits, which were excluded as hearsay).

18

**POINT III**

**THE UNDERWRITERS' EVIDENT PARTIALITY ARGUMENT  IS MERITLESS BECAUSE THE UNDERWRITERS CANNOT MEET THEIR HEAVY BURDEN TO DEMONSTRATE THAT A REASONABLE PERSON WOULD HAVE TO CONCLUDE THAT MR. CAMPOS WAS GUILTY OF EVIDENT PARTIALITY**

The Underwriters have launched a multi-pronged attack on ICA's party-appointed arbitrator, Mr. Campos. They claim that the Award must be vacated because Mr. Campos allegedly failed to disclose an alleged financial interest in the outcome of the arbitration. They also accuse Mr. Campos of having been involved in prior litigation, which the Underwriters claim demonstrates that he is supposedly "unfit" to be an arbitrator in the financial services field.

As stated previously, however, the only arbitrator qualification applicable to Mr. Campos is that he be "disinterested," that is, "lacking a financial or other personal stake in the outcome." *Trustmark Ins. Co. v. John Hancock Life Ins. Co.*, 631 F.3d 869, 872 (7th Cir. 2011) (Easterbrook, J.). "Disinterested" most assuredly does not mean free from the London Reinsurers' apparent and unwarranted character assasination attempts, and unilateral judgments about an arbitrators' "fitness" to be an arbitrator in the "financial services industry."  But those attacks, while unjustified, are legally irrelevant.

Section 10(a)(2) of the FAA provides that courts may vacate an arbitral  award "where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). To vacate an award for evident partiality, the challenging party must demonstrate that "a reasonable person would have to  conclude that an arbitrator was partial to one party in the arbitration." *Scandinavian Re*, 668 F.3d at 72

(citing and quoting *Morelite v. N.Y.C. Dist. Council Carpenters*, 748 F.2d 79, 84 (2d Cir. 1984). The test does not require proof of actual bias, but evident partiality must be established by "objective facts inconsistent with impartiality." The evidence of evident partialityy must be "dirrect" and not "speculative," *Kolel*, 729 F.2d at 104, and must be shown by "clear and convincing evidence." *Kolel*, 729 F.2d at 106.

While the Second Circuit has not yet had occasion to decide the issue, a number of courts have found that, because party-appointed arbitrators in tripartite industry arbitrations often expect that the party appointed arbitrators will play the role of an advocate of sorts, either evident partiality principles do not apply to such arbitrators, or the standard for proving it is even more daunting than it already is. *See, e.g., Sphere Drake Ins. Co. v. All American Life Ins. Co.*, 307 F.3d 617, 622 (7th Cir. 2002); *Lozano v. Maryland Cas. Co.d. Cos. Co.*, 850 F.2d 1470, 1472 (11th Cir. 1988); *Re Astoria Medical Group v. Health Ins. Plan of Greater N.Y.*, 11 N.Y.2d 128, 133-34 (1962); *Winfrey v. Simmons Foods, Inc.*, 495 F.3d 549, 551-52 (8th Cior. 2007); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 645-47 (6th Cir. 2005). Here, even though the parties agreed the arbitrators would be "disinterested," their agreement to allow ex parte contacts through discovery evidences that the parties did not intend their arbitrators to be impartial.

Finally, contrary to the Underwriters' suggestion, an arbitrators' failure to adhere to ethical rules or guidelines concerning disclosure does not constitute evident partiality. *Scandinavian Re*, 668 F.3d at 77 n.22 (citing cases). And the failure to disclose, in and of itself is likewise not a ground on which to vacate an award. *See* 668 F.3d at 76-

Once again, the Underwriters fall far short of the demanding burdent they

would have to meet in this case to show evident partiality.Doing so would require direct, objective evidence that Mr. Campos somehow had a financial  or personal interest in the outcome of the arbitrator.

The Underwriters have attempted to meet this burdent by attempting to create the misleading impression that there are nefarious relattionships between and among a number of  individuals that, taken together, somehow demonstrate that Mr. Campos is interested in the outcome.

Mr. Hirst has submitted a certification that demonstrates that there is no basis whatsoever to the Underrwriters' assertions, and that, in fact, Mr. Cam;os never had, and does not have now, an interest in the outcome of the arbitration. (See Hirst ICA I Cert. at ¶¶16-21, 27-38.)

**CONCLUSION**

For all of the foregoing reasons, ICA respectfully requests that the Court deny the Third Party Underwriters' motion to vacate and grant ICA's cross-motion to confirm.

Dated:    New York, New York
          February 26, 2016

                              LOREE & LOREE

                         By: _____
                              Philip J. Loree Jr. (PL-2213)
                              830 Third Avenue
                              Fifth Floor
                              New York, New York 10022
                              (646) 253-0560
                              (516) 627-1720 (alternative
                              phone no.)
                              (516) 941-6094 (mobile)
                              Fax: +1 (800) 627-3118
                              PJL1@LoreeLawFirm.com

                              ATTORNEYS FOR
                              RESPONDENT INSURANCE
                              COMPANY OF THE AMERICAS

To all counsel in this consolidated
Proceeding (Via ECF):

22